254 P.3d 948 (2011)
STATE of Washington, Respondent,
v.
Daniel D. BEA, Appellant.
No. 28540-5-III.
Court of Appeals of Washington, Division 3.
July 12, 2011.
*949 Janet G. Gemberling, Gemberling & Dooris PS, Spokane, WA, for Appellant.
Andrew Kelvin Miller, Benton County Prosecutor's Office, Julia Lindsay Eisentrout, Attorney at Law, Terry Jay Bloor, Benton County Prosecutors Office, Kennewick, WA, for Appellant.

OPINION PUBLISHED IN PART
SIDDOWAY, J.
¶ 1 Daniel Bea was convicted of first degree assault after he seized a kitchen knife and stabbed Carlos Cruz at Mr. Cruz's home, seconds after guests had broken up a fist-fight *950 between the two. Mr. Bea claimed to have acted in self-defense and argues on appeal that the evidence did not support the trial court's decision to give a first aggressor instruction, which would negate his self-defense theory if the jury determined that he provoked the actions of Mr. Cruz. He also takes issue with how the jury was instructed on a deadly weapon special verdict form based on State v. Bashaw[1] and claims that he is entitled to a new trial because the prosecutor misstated the law during closing argument. Mr. Bea raises three other arguments in his statement of additional grounds pertaining to ineffective assistance of counsel, sufficiency of the evidence, and the rule-based speedy trial right.
¶ 2 We reject Mr. Bea's challenges and affirm.

FACTS AND PROCEDURAL BACKGROUND
¶ 3 Daniel Bea and his girl friend, Shakira Pointer, attended a party at the home of Carlos Cruz on the evening of April 11, 2009 that ran into the early hours of the following day. At approximately 3 a.m., Mr. Bea and his girl friend began arguing in the bathroom. Mr. Cruz asked the two to leave but Mr. Bea refused and held the bathroom door shut. Mr. Cruz and a few of his friends then forced the door open to gain entrance to the bathroom, after which Mr. Bea and Mr. Cruz started fighting. According to Mr. Bea, Mr. Cruz started the encounter by punching him in the face.
¶ 4 The fight was broken up by other guests and the two men were briefly separated. Mr. Bea headed toward the front door, from which other guests initially inferred he was leaving, but instead he veered into the kitchen and grabbed at least one knife. Mr. Cruz was then being detained by a female guest but he pushed her away when Mr. Bea approached him. The two grappled again, during which Mr. Bea stabbed Mr. Cruz in the midsection repeatedly. After guests separated the two a second time, Mr. Bea ran from the home. Mr. Cruz was taken to the hospital, where he was treated for five stab wounds and a displaced rib. One of the stab wounds, to the left chest, penetrated to the lateral chest wall; at the emergency room, a chest tube was placed into the wound to evacuate air and blood, the wound was irrigated, and it was closed with staples. The remaining wounds were one to two centimeters deep and were irrigated, treated with antibiotics, and left to heal naturally. Mr. Cruz was administered pain killers and admitted to intensive care for observation given the risk of a delayed bleed associated with the chest wound. He spent four days in the hospital. Mr. Bea was charged with first degree assault.
¶ 5 The court instructed the jury on self-defense, including, over defense counsel's objection, the pattern "first aggressor" instruction. This instruction provides that a defendant may not claim self-defense if he or she provoked or commenced the altercation. The jury was also instructed regarding a deadly weapon special verdict form. It was instructed that when answering the form, "If you unanimously have a reasonable doubt as to this question, you must answer `no.'" Clerk's Papers (CP) at 111 (Instruction 26). No objection was made to this instruction.
¶ 6 The jury was instructed on the charged offense of first degree assault and lesser charges of second and third degree assault. During closing argument, the prosecutor argued that the evidence supported the intent element of first degree assault, stressing several times that "[w]e intend the results that are reasonable from our actions. That's the legal standard. We intend the results, the natural results of our acts." Report of Proceedings (RP) (July 22, 2009) at 125-26. Defense counsel made no objection to any of the prosecutor's closing remarks.
¶ 7 Mr. Bea was found guilty of first degree assault and sentenced to 117 months, which includes 24 months for the deadly weapon sentencing enhancement. This appeal followed.

ANALYSIS

I
¶ 8 The court instructed the jury on self-defense in light of evidence (principally Mr. *951 Bea's testimony) that Mr. Cruz and his friends started the fight between the two. However, because there was conflicting evidence over who provoked the fight, and one who provokes an affray cannot invoke the right of self-defense, State v. Wingate, 155 Wash.2d 817, 822, 122 P.3d 908 (2005) (citing State v. Craig, 82 Wash.2d 777, 783, 514 P.2d 151 (1973)), the court also gave the first aggressor instruction requested by the State, over Mr. Bea's objection. The instruction stated:
No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense and thereupon use[] force upon another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense is not available as a defense.
CP at 106 (Instruction 23).
¶ 9 A first aggressor instruction potentially removes self-defense from the jury's consideration, relieving the State of its burden of proving that a defendant did not act in self-defense. State v. Douglas, 128 Wash. App. 555, 563, 116 P.3d 1012 (2005). For that reason, it is only to be given sparingly and carefully, in cases where the theories of the case cannot be sufficiently argued and understood by the jury without such an instruction. State v. Riley, 137 Wash.2d 904, 910 n. 2, 976 P.2d 624 (1999).
¶ 10 Mr. Bea argues that it was error to give the first aggressor instruction because the evidence was clear that it was Mr. Cruz and his friends who broke down the bathroom door and that he and Mr. Cruz both testified that once the bathroom door was breached it was Mr. Cruz, not he, who threw the first punch. He relies on the statement, "I hit him. He hits me" from the following testimony from Mr. Cruz:
A . . . I went to the bathroom and asked them to leave the house and they refused to and I told them that I was the owner of the house and everybody was leaving. They kept arguing. I kept insisting you got to go and my friend, you got to go. Then later on I heard the girlfriend, woman crying. That's when Reynaldo and Bernal and I opened the door.
Q Who? Eric Bernal?
A Yes. We kept insisting. He refused. He started beating on the door and trashing the bathroom. A few minutes later he comes out and he and I go at it. We wrestle. I hit him. He hits me. Then we stopped and he had a choice to leave the house. There was a hallway to leave but he didn't. He grabbed two knives and he stabbed me  it was actually six times. Two times here. Two times here and one on the side and here.
RP (July 21, 2009) at 3-4 (emphasis added). It is not clear that Mr. Cruz's testimony, "I hit him. He hits me" was a concession by Mr. Cruz that he threw the first blow. If defense counsel thought it might be, he inexplicably avoided revisiting the issue and clarifying the matter during cross-examination. In any event, other witnesses testified that Mr. Bea came at Mr. Cruz first; Ricardo DeJesus testified that on coming out of the bathroom, Mr. Bea "jumped into my friend," Id. at 65, and Zolia Rodriguez Cruz, Mr. Cruz's sister, testified that Mr. Bea broke the bathroom door, "And then finally he got out of the bathroom pushing my brother." Id. at 78. A number of witnesses also testified that prior to any blows, Mr. Bea had ignored Mr. Cruz's repeated requests that he leave, had held the bathroom door shut against Mr. Cruz's efforts to enter, and could be heard slamming or breaking items in the bathroom.
¶ 11 Whether the State produced sufficient evidence to justify a first aggressor instruction is a question of law and our review is therefore de novo. State v. Stark, 158 Wash.App. 952, 959, 244 P.3d 433 (2010) (citing State v. Anderson, 144 Wash.App. 85, 89, 180 P.3d 885 (2008)), review denied, 171 Wash.2d 1017, 253 P.3d 392 (2011). When determining if evidence at trial was sufficient to support the giving of an instruction, we view the supporting evidence in the light most favorable to the party that requested the instruction. Wingate, 155 Wash.2d at 823 n. 1, 122 P.3d 908 (citing State v. Fernandez-Medina, 141 Wash.2d 448, 455-56, 6 P.3d *952 1150 (2000)). The State need only produce some evidence that Mr. Bea was the aggressor to meet its burden of production. Id. at 823, 122 P.3d 908 (citing Riley, 137 Wash.2d at 909-10, 976 P.2d 624).
¶ 12 The provoking act must be intentional and one that a "`jury could reasonably assume would provoke a belligerent response by the victim.'" State v. Wasson, 54 Wash. App. 156, 159, 772 P.2d 1039 (quoting State v. Arthur, 42 Wash.App. 120, 124, 708 P.2d 1230 (1985)), review denied, 113 Wash.2d 1014, 779 P.2d 731 (1989). The unlawful act constituting the provocation need not be the actual striking of a first blow. State v. Hawkins, 89 Wash. 449, 154 P. 827 (1916). It must be related to the eventual assault as to which self-defense is claimed. Wasson, 54 Wash. App. at 159, 772 P.2d 1039. The provoking act cannot be the actual assault. State v. Kidd, 57 Wash.App. 95, 100, 786 P.2d 847, review denied, 115 Wash.2d 1010, 797 P.2d 511 (1990).
¶ 13 Here, viewing the supporting evidence in the light most favorable to Mr. Bea, the aggressor instruction was properly given. Mr. Bea was not entitled to invoke the defense of self-defense if he provoked Mr. Cruz by initiating a fight once the bathroom door was forced open. Nor was Mr. Bea entitled to invoke the defense of self-defense if he provoked a reasonable use of force by Mr. Cruz after refusing to leave the home as requested, blocking entry to the bathroom, and wreaking damage behind the closed door. As explained in Riley, in order to invoke self-defense, the force defended against must be unlawful force. 137 Wash.2d at 911, 976 P.2d 624. An owner of property may lawfully use reasonable force to expel a malicious trespasser. RCW 9A.16.020; State v. Bland, 128 Wash.App. 511, 513 n. 1, 116 P.3d 428 (2005). The first aggressor instruction was needed for the State to argue that these acts could negate Mr. Bea's theory of self-defense.

II
¶ 14 Mr. Bea next argues that his deadly weapon sentencing enhancement must be vacated because the jury was incorrectly instructed that it had to be unanimous to answer the special verdict form in the negative. The challenged instruction provided in part that "[b]ecause this is a criminal case, all twelve of you must agree in order to answer the special verdict form," and that "[i]f you unanimously have a reasonable doubt as to this question, you must answer `no.'" CP at 111 (Instruction 26). Under State v. Bashaw, this is an incorrect statement of law. 169 Wash.2d at 147, 234 P.3d 195 (holding that juror unanimity "is not required to find the absence of such a special finding"). But Mr. Bea did not object to the instruction.
¶ 15 We have recently held that instructional error providing that a jury must deliberate to unanimity to answer "no" to a special interrogatory finding an aggravating factor for a sentencing enhancement is not manifest constitutional error, and cannot be raised for the first time on appeal. State v. Nunez, 160 Wash.App. 150, 248 P.3d 103, petition for review filed, No. 85789-0 (Wash. Mar. 25, 2011). Consistent with that decision, we decline to review the issue.

III
¶ 16 Mr. Bea finally contends that he is entitled to a new trial as a result of alleged prosecutorial misconduct. He claims the prosecutor committed misconduct by informing the jury during closing argument that the act of stabbing a victim establishes a defendant's intent to inflict great bodily harm as a matter of law. The State responds that this is a mischaracterization of the prosecutor's remarks, which accurately stated the law. Alternatively, it argues that Mr. Bea has not made the required showing of prejudice.
¶ 17 "Intent" to commit a criminal act means more than merely "knowledge" that a consequence will result. Compare RCW 9A.08.010(1)(a) (defining "intent") with RCW 9A.08.010(1)(b) (defining "knowledge"); State v. Caliguri, 99 Wash.2d 501, 505, 664 P.2d 466 (1983). "Intent" exists only if a known or expected result is also the actor's "objective or purpose." Caliguri, 99 Wash.2d at 506, 664 P.2d 466 (citing RCW 9A.08.010(1)(a)). Where there is no direct evidence of the actor's intended objective or *953 purpose, intent may be inferred from circumstantial evidence. Id. (citing State v. Shelton, 71 Wash.2d 838, 839, 431 P.2d 201 (1967)). A jury may infer criminal intent from a defendant's conduct where it is plainly indicated as a matter of logical probability. State v. Myers, 133 Wash.2d 26, 38, 941 P.2d 1102 (1997) (citing State v. Bright, 129 Wash.2d 257, 270, 916 P.2d 922 (1996)). This includes inferring or permissively presuming that a defendant intends the natural and probable consequences of his or her acts. Caliguri, 99 Wash.2d at 506, 664 P.2d 466 (citing State v. Caldwell, 94 Wash.2d 614, 617-18, 618 P.2d 508 (1980)).
¶ 18 While the trier of fact is permitted to draw an inference or presumption that a defendant intends the natural and probable consequences of his or her acts, however, the defendant is entitled to have the jury give equal consideration to the possibility that he did not act intentionally, including any theory of nonintentional conduct that he might offer. Accordingly, it is well settled that it is constitutional error for a court to instruct a jury that the law presumes that a person intends the ordinary consequences of his voluntary acts. Sandstrom v. Montana, 442 U.S. 510, 512-13 & n. 3, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) (noting that many courts had found such instruction fatal to a conviction and the standard reference work for federal jury instructions characterized such instruction as "clearly erroneous," and as constituting reversible error). An instruction that suggests to the jury that such a presumption is conclusive, or that it shifts the burden of persuasion on the issue of intent to the defendant, relieves the State of the burden of proving an essential element of the crime beyond a reasonable doubt and represents constitutional error. Id. at 520, 99 S.Ct. 2450; accord Caldwell, 94 Wash.2d at 618, 618 P.2d 508. The giving of such an instruction is not cured by other instructions on the presumption of innocence or which allocate the burden of proof beyond a reasonable doubt to the State. A jury could reasonably assume that whether the State has met its burden is determined after giving it the benefit of the presumption. Sandstrom, 442 U.S. at 518 n. 7, 99 S.Ct. 2450; Caldwell, 94 Wash.2d at 617, 618 P.2d 508. A defendant's due process rights are also violated if the jury is instructed that it may presume intent unless the defendant's conduct shall be explained by evidence satisfactory to the jury to have been made without such criminal intent. State v. Deal, 128 Wash.2d 693, 701, 911 P.2d 996 (1996) (finding instructional error, but that it was harmless).
¶ 19 In this case, Mr. Bea is complaining that the prosecutor misstated the law in closing argument, not that the trial court improperly instructed the jury. This implicates different standards of review, which we discuss below. First, though, we consider the State's argument that the prosecutor did not misstate the law.
¶ 20 In closing, the State asked the jury to convict Mr. Bea of the charged crime of first degree assault rather than the lesser crimes of second and third degree assault. In order to prove first degree assault, the State had the burden of proving not only that the force and means used by Mr. Bea was likely to produce great bodily harm or death, but that producing great bodily harm was also what Mr. Bea intended.[2] In defense, Mr. Bea requested a voluntary intoxication instruction and argued self-defense; he also testified that after the bathroom door was broken down, Mr. Cruz charged him, the two fought, he put Mr. Cruz in a choke hold, and from there,
A . . . While sitting there, I felt people hitting me in my back and kicking me and on the other side of me people was trying *954 to pull Carlos from me. So I let go of Carlos. When I got up Shakira was holding people back and couple other people holding people back, I tried to head up and get out the door.
Q Which door were you trying to get to?
A The front door.
Q Where was that in relation to the hallway were you?
A Right when I turn, the hallway it like right in front of it.
Q How many feet do you think?
A Probably 20, 15 feet.
Q And what happened next?
A I seen people start coming at me so I looked in the kitchen and I seen the knives, so I hurry up and made my way to the kitchen and I grabbed the knife and I turned around to try to make my way out of the house. When I turned around to go out the door, Carlos tackled me and a bunch of his friends tackled me and started hitting me and I fell on the couch and they start hitting me, hitting me in the head and hitting me with objects.
Q You still have the knife?
A Yes.
Q Did you swing out with the knife?
A Yes.
Q What happened next as you remember it?
A I just remembered that I dropped the knife and I seen people like getting pulled off of me. Shakira was pulling people off of me, then they pulled people up, pushed me out the door because right when she pulled me up I was right in front of the door. She pushed me out the front door. She grabbed me. We started running.
RP (July 22, 2009) at 109-11. And later,
Q Do you remember roughly how many people were in that first fight in the hallway by the bathroom? Do you remember how many were there?
A It was a lot. The whole hallway was crowded.
Q And when you grabbed the knives and turned around to face the door, how many people were between you and that door?
A It was more in the hallway.
Q Were those people standing by the door or coming toward you?
A They was coming toward me.
Q Did you intend to stab Mr. Cruz?
A No.
Q What were you trying to do?
A I was  I thought if I had the knife, they wasn't going to come toward me, they would stop, but Carlos and his friends kept attacking me.
[DEFENSE COUNSEL]: That's all I have.
Id. at 112-13. Defense counsel argued in closing that the jury should convict Mr. Bea of, at most, third or second degree assault.[3]
¶ 21 In closing, the State's principal argument on the issue of intent was that any contention that Mr. Bea had not acted with the intent and purpose of committing a first degree assault was not viable. He argued:
We intend the results that are reasonable from our actions. That's the legal standard. We intend the results, the natural results of our acts. We can't just say if I pull a gun at somebody, pull the trigger, I just meant to hit their shoulder and didn't mean to cause any serious injury. You can't say that if you point a gun, pull the trigger your intent is not to cause har[m] *955 but the natural result of that is to cause huge injury, great bodily harm. Likewise you can't just say I stabbed the person and I didn't really mean anything by it. If you take a knife, that big of a knife that we've shown you over and over, jab it into somebody with enough force to break it off, enough force to fracture a rib, doesn't matter what you say your intent is the natural obvious consequences, you're intended results in stabbing somebody with a knife is to cause huge significant injuries.. . . So what are the expected results if you stab someone, if you stab another person, if you shoot another person with a gun your intent is to cause great bodily harm. It doesn't matter if the defendant said I didn't mean to kill him or didn't want to kill him. If you stab somebody that is the natural expected result.
Id. at 125-26. Defense counsel did not object to these statements nor address them in his closing argument. But in reply, the prosecutor reiterated his point:
What matters is what the defendant intended from the consequences of his act and I will stand by that statement if you pour a bottle of water or bottle of Pepsi on the floor the floor is going to get wet. Doesn't matter if you think I never thought of it. If you point a gun at somebody and pull a trigger doesn't matter if you wanted to aim high and scare them. If you hit them in the chest you are responsible for that. You are responsible for what the normal consequences of your actions. That's what legally that is what intent is. You intend to do what the normal results of your act would be.
Id. at 142-43.
¶ 22 The prosecutor's statements that (1) "it doesn't matter" what a defendant contends his intent was, (2) a defendant "can't say" that he lacked intent, and (3) "the legal standard" and "legally what intent is" is determined from the consequences of a defendant's actions, are all misstatements of the law and of the court's instructions. They had the effect, with respect to the charge of first degree assault of collapsing the intent element into the assault element. The question becomes whether this misstatement of the law is misconduct requiring a new trial, as Mr. Bea requests on appeal.
¶ 23 A defendant claiming prosecutorial misconduct must establish the impropriety of the prosecution's comments and their prejudicial effect. State v. McKenzie, 157 Wash.2d 44, 52, 134 P.3d 221 (2006). Comments are prejudicial only where "there is a substantial likelihood the misconduct affected the jury's verdict." State v. Brown, 132 Wash.2d 529, 561, 940 P.2d 546 (1997), cert. denied, 523 U.S. 1007, 118 S.Ct. 1192, 140 L.Ed.2d 322 (1998). A reviewing court does not assess the prejudicial effect of a prosecutor's improper comments by looking at the comments in isolation but by placing the remarks in the context, among other things, of the instructions given to the jury. Id. A defendant who fails to object to an improper comment waives the error unless the comment is "so flagrant and ill-intentioned that it causes an enduring and resulting prejudice" that a curative instruction could not have neutralized the prejudice. Id.
¶ 24 It would have been appropriate and expected for the State to argue the jury's right to infer intent. "Specific intent cannot be presumed, but it can be inferred as a logical probability from all the facts and circumstances." State v. Wilson, 125 Wash.2d 212, 217, 883 P.2d 320 (1994) (citations omitted). Given well-settled law, however, the difference between a legitimate inference or permissive presumption and an unconstitutional conclusive presumption should have been clear to the State, and only the permitted inference should have been argued. But no objection was made to the prosecutor's argument.
¶ 25 The jury was instructed that the law was contained in the court's instructions, that it should disregard any argument by the lawyers not supported by the law in the court's instructions, and it received instructions from the court on intent that were correct. While the prosecutor's argument was erroneous, we do not regard it as flagrant or ill-intentioned; Mr. Bea has not persuaded us that the prosecutor could not have argued with equal effectiveness that logic, not the law, compelled inferring intent. *956 Defense counsel argued without objection that the jury could (and at worst should) find the lesser crimes. Finally, we are confident that the court could easily have clarified the distinction between a permitted inference and an unwarranted presumption, had it only been asked. Under these circumstances, a new trial is not warranted.
¶ 26 We affirm.
¶ 27 The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions. RCW 2.06.040.
WE CONCUR: KULIK, C.J., and KORSMO, J.
NOTES
[1] 169 Wash.2d 133, 234 P.3d 195 (2010).
[2] The jury was instructed as follows:

A person commits the crime of assault in the first degree when, with intent to inflict great bodily harm, he or she assaults another with any deadly weapon by any force or means likely to produce great bodily harm or death.
CP at 87 (Instruction 6), and
To convict the defendant of the crime of assault in the first degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
. . . .
(2) That the assault was committed with . . . a deadly weapon or by a force or means likely to produce great bodily harm or death;
(3) That the defendant acted with intent to inflict great bodily harm.
CP at 88 (Instruction 7).
[3] The jury was instructed with respect to second degree assault, "A person commits the crime of assault in the second degree when he or she intentionally assaults another and thereby recklessly inflicts substantial bodily harm or assaults another with a deadly weapon." CP at 94 (Instruction 13). It was instructed with respect to third degree assault, "A person commits the crime of assault in the third degree when he or she with criminal negligence, causes bodily harm to another person by means of a weapon or other instrument or thing likely to produce bodily harm, or with criminal negligence, causes bodily harm accompanied by substantial pain that extends for a period sufficient to cause considerable suffering." CP at 99 (Instruction 17).