IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 33855-0-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| BRANDON O. KEELE, | ) | |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. —Brandon Keele appeals convictions for three crimes arising from

his efforts to elude officers in an early morning, high speed chase. He argues that in light

of his alibi, the car owner's recantation of an earlier identification of Mr. Keele, and the

alleged implausibility of several officers' identifications, the evidence was insufficient to

support the convictions. Because the State's evidence was more than sufficient and Mr.

Keele raises no meritorious challenges in a statement of additional grounds, we affirm.

FACTS AND PROCEDURAL BACKGROUND

Shortly after midnight on the first Saturday in October 2014, Trooper Leon

Legros, who was working eastbound traffic on State Route 2[1] between Leavenworth and

---

[1] We use the highway's popular name, which all witnesses used during trial, recognizing that its official designation is U.S. Route 2.

Wenatchee, stopped a black Hyundai Tiburon for speeding. Two men were sitting in the front seats. The trooper approached the car on the passenger side and asked the driver to produce a driver's license, registration, and insurance. When he didn't, the trooper asked the driver to step out of the car and began walking around the rear of the car to meet him. The driver suddenly put the car in gear and sped off. The trooper first radioed that the driver of the car had fled and then got in his patrol car to follow him.

Trooper Michael Dufour was in the vicinity, heard Trooper Legros's report, and saw a car traveling eastbound toward him at a speed he estimated at 100 miles per hour. He turned into the median, into eastbound traffic, and began pursuit. He chased the driver of the Tiburon into Douglas County at speeds of up to 130 miles per hour. In East Wenatchee, the car made a series of turns. Being unfamiliar with the neighborhood, the trooper considered terminating the pursuit. He stopped in the road where he had last seen the driver turn left and, looking to his left, realized that the driver had turned into a private driveway and was stopped on a parking pad. The Tiburon's reverse lights suddenly came on and it sped out of the driveway in reverse, ramming the front left side of Trooper Dufour's vehicle in the process. The driver then put the Tiburon in forward gear, scraped by the trooper's car, and headed down another driveway that also proved not to be a through street. Trooper Dufour followed into the second driveway and, seeing the Tiburon high centered in a flowerbed, stepped out of his patrol car and shone his flashlight toward it. The driver was able to get the car moving again and drove through

2

the yard, down an embankment, and out of sight. On returning to his patrol car, Trooper Dufour saw that his left front wheel was bent and found that his steering was compromised. He concluded his car was too damaged to drive.

Shortly thereafter, other responding officers found the abandoned Tiburon nearby and then located Jeffrey Morris, who admitted to having been the car's passenger. He also turned out to be its owner. Mr. Morris was taken back to where Trooper Dufour's disabled car remained parked. Morris later described himself as "highly intoxicated" that night and stated he had driven his car to Leavenworth for Oktoberfest, but friends saw to it that someone else would drive him home. Report of Proceedings (RP) at 166. Mr. Morris provided a name for the driver of "Brandon Keele" or something similar. Sergeant Kirk Schneider used his in-car computer to pull up a Department of Licensing (DOL) photograph of Mr. Keele and showed it to Mr. Morris. Mr. Morris stated that he was 80 percent sure Mr. Keele had been the driver.

Trooper Dufour was notified of this information, pulled up Mr. Keele's DOL photograph himself, and recognized him as the man he had seen driving the Tiburon.

In a seemingly unrelated incident nine hours after Trooper Legros's initial stop, East Wenatchee Police Officer Carrie Knouf responded to a family's complaint that an unknown man was sleeping on a couch in their backyard, which the officer would later realize was about six blocks from where the Tiburon rammed Trooper Dufour's car. Officer Knouf contacted the man, woke him, and asked him for identification, which he

3

did not have. Asked for his name, he answered "Josh R. Taylor." RP at 206. Officer Knouf told the man he was free to leave, and he did.

Later that day, Officer Knouf had a chance to investigate Josh R. Taylor, learned it was used as an alias by Brandon Keele, and looked up a booking photo of Mr. Keele. She recognized him as the man she had contacted. Officer Knouf described the trespasser she had contacted as very dirty, with a shaved head and scratches on his head and hands, and as wearing a dark sweat jacket, dark colored shorts, white socks and no shoes.

The State charged Mr. Keele with one count of assault in the second degree, one count of malicious mischief in the first degree, and one count of attempting to elude a pursuing police vehicle.[2]

At trial, Mr. Morris denied that Mr. Keele was driving his car on the night of the chase, stating that he "vaguely" knew Mr. Keele but had not seen him since the beginning of the summer in 2014. RP at 164. He testified he did not remember telling officers that Mr. Keele drove his car that night, but when a recorded statement to police was played for him, he agreed it was his voice.

---

[2] The original information included a fourth charge of malicious mischief in the third degree, apparently related to damage to the landscaping at the residence where Mr. Keele escaped through the rear yard. The jury was not instructed on the fourth charge but the record does not reveal when or why it was dismissed.

4

Mr. Keele testified in his own defense and claimed that on the early morning of the chase, he was in Tonasket, where he had gone to a barter fair with his father and a girlfriend, and had spent the night. He testified that while he had used Mr. Morris's Tiburon "many times" before, including as recently as five weeks before the chase, he would not have been using it on the night of the crimes because he had "whipped [Morris's] ass" the week before, and "we weren't getting along at that time." RP at 260, 254, 259. To cast doubt on the reliability of the officers' identification, Mr. Keele's lawyer had him show jurors the full sleeve tattoos on his arms and prominent tattoos on his legs, none of which had been mentioned by police and all of which he said he had had "for years." RP at 257.

Both Mr. Keele's father and a family friend testified they were with Mr. Keele at the barter fair when the high speed chase occurred.

In the State's case, however, Troopers Legros and Dufour had both identified Mr. Keele as the driver of the Tiburon and Officer Knouf identified him as the trespasser she had contacted the morning after the chase. Each had provided substantially similar descriptions of the man they had observed on that day in October and each described the circumstances under which they were able to observe him.

Trooper Legros testified that he had his overhead lights on when he stopped the Tiburon and that they illuminated the car well. He said he had gotten a good look at both the passenger and driver from the passenger's window and that the driver was wearing a

5

black shirt, black shorts, and "was either close to bald or [had] very tightly cut hair, [and] clean facial features." RP at 142. He testified that after Mr. Keele and Mr. Morris were identified as the possible driver and passenger, he had been sent their DOL photographs and identified them as the driver and passenger he had encountered in the traffic stop. In identifying Mr. Keele as the driver at the time of trial, Trooper Legros stated he was "very certain" that it was Mr. Keele who had been driving the car. RP at 147.

Trooper Dufour testified that as he chased the Tiburon, he got within two car lengths for a stretch, and with the benefit of his spotlight had been able to see the driver and the passenger's faces in the rearview and the side mirrors—well enough to see them smiling. As the cars' speeds slowed in East Wenatchee, he said he was able to get a "great view of the side of them" when the Tiburon made turns. RP at 124. When the Tiburon rammed his car, he said he was within a few feet of its passenger side. And he said he was within 40 feet of the high-centered Tiburon when he got his last view of the occupants using his flashlight. He testified that on the morning following the chase he had looked up Mr. Keele's DOL photo and booking photo and identified him as the driver; at trial he said he had "no doubt" about his identification. RP at 113. During the chase, Trooper Dufour had radioed a description of the driver as "clean shaven, wearing a ball cap, [and] a black shirt," although at a later point in the chase he saw that the driver was no longer wearing the cap. RP at 101.

The jury found Mr. Keele guilty as charged. He appeals.

6

ANALYSIS

Mr. Keele argues that insufficient evidence existed for a rational trier of fact to find an essential element of the crimes charged: that he was the driver of the Tiburon.

In criminal prosecutions the State "bears the burden of establishing beyond a reasonable doubt the identity of the accused as the person who committed the offense." *State v. Hill*, 83 Wn.2d 558, 560, 520 P.2d 618 (1974). As with all sufficiency challenges, "[t]he test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). In a sufficiency challenge, "all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." *Id.* A defendant raising such a challenge "admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *Id.*

We defer "to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." *State v. Cordero*, 170 Wn. App. 351, 361, 284 P.3d 773 (2012).

Mr. Keele could point to his alibi, extensive tattoos that had not been described by the officers who identified him, and Mr. Morris's recantation that Mr. Keele was the driver. But the State could point to the uncontested involvement of Mr. Morris's car, Mr. Keele's uncontested relationship with Mr. Morris, Mr. Morris's original statement that he

7

was 80 percent sure Mr. Keele had been the driver, two officer-eyewitnesses who confidently identified Mr. Keele as the driver, and another who confidently placed him within six blocks of where the driver had fled on foot hours earlier. The State's evidence that Mr. Keele was the driver was more than sufficient.

## STATEMENT OF ADDITIONAL GROUNDS

In a pro se statement of additional grounds (SAG), Mr. Keele raises seven. His second and fourth challenge the sufficiency of the evidence of identity, which has already been addressed. Mr. Keele makes the additional argument that State had no DNA[3] or fingerprints tying him to the car, but such evidence is never essential and would not have been helpful in this case, since Mr. Keele's own evidence established that he had driven the car many times, including within weeks before the chase.

*Whether Washington law criminalizing second degree assault is unconstitutionally vague.* Citing to *Johnson v . United States*, __ U.S. __, 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015) and *Dimaya v. Lynch*, 803 F.3d 1110 (9th Cir. 2015), *cert. granted*, __ U.S. __, 137 S. Ct. 31, 195 L. Ed. 2d 902 (2016), Mr. Keele argues that Washington law criminalizing second degree assault is unconstitutionally vague.

The cases on which Mr. Keele relies involve the particular problem of vagueness presented when application of a law requires a court to determine, using a "*categorical*

---

[3] Deoxyribonucleic acid.

8

approach," whether a crime was, in the case of *Johnson*, a felony that "'involves conduct that presents a serious potential risk of physical injury to another,'" 135 S. Ct. at 2554-55 (quoting 18 U.S.C. § 924(e)(2)(B)) or, in the case of *Dimaya*, was a "crime of violence" by virtue of 18 U.S.C. § 16(b). 803 F.3d at 1112. The difficulty with the categorical approach is that it ties a court's assessment to "a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements." *Johnson*, 135 S. Ct. at 2557.

In proceedings below, no one was required to engage in any categorical analysis. The jury was presented with real-world facts and statutory elements. The vagueness problem addressed by *Johnson* and *Dimaya* was not present in Mr. Keele's trial.

*Ineffective assistance of counsel.* Mr. Keele argues that he received ineffective assistance of trial counsel. To establish ineffective assistance of counsel, a defendant must show that (1) defense counsel's representation was deficient and (2) the deficient representation prejudiced the defendant. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). When a claim can be disposed of on one ground, this court need not consider both prongs. *Strickland v. Washington*, 466 U.S. 668, 697, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

Mr. Keele first contends that an effective attorney would have moved to exclude evidence of booking photos used by law enforcement to identify Mr. Keele as the driver of the Tiburon. This court has held that because the use of booking photos may raise a prejudicial inference of criminal propensity, a court abuses its discretion when it admits

9

them in a case where they have no bearing on a material issue. *State v. Sanford*, 128 Wn. App. 280, 286, 115 P.3d 368 (2005). Here, however, the State had two articulable reasons for offering the photos: (1) after investigating officers had Mr. Keele's name (or, in Officer Knouf's case, his alias), the photos were a means by which the three officer-eyewitnesses contemporaneously identified him; and (2) Mr. Keele's appearance (hair and facial hair) had changed by the time of trial, and witnesses testified the booking photos better depicted his appearance at the time of the crimes. As for prejudice, Mr. Keele testified and admitted to three prior guilty pleas to making a false or misleading statement to a public servant, so the jury was aware he had a criminal history. He does not show the absence of a strategic reason for not challenging the photos or that he was prejudiced by their admission.

Mr. Keele next contends his trial lawyer was ineffective for failing to object at eight identified points during trial. At every point identified, Mr. Keele's trial lawyer would have had a legitimate reason for not objecting. At three points (RP at 111, 142, and 148), the prosecutor asked harmless leading questions that could easily have been rephrased, with no reason to believe the witness would not have given the same answer. It is common not to object to occasional leading questions under such circumstances. Three other points identified by Mr. Keele involved nonobjectionable questioning. *See* RP at 132 (legitimate clarifying question); RP at 141 (eliciting an out of court statement not for its truth, but to explain action taken in response); and RP at 144 (nonleading

10

question). Proceedings at RP pp. 83-84 were outside the presence of the jury, with the prosecutor explaining how he intended to introduce secondhand evidence of Mr. Morris's identification of Mr. Keller under ER 801(d)(1)(iii); there was no reason to object. Finally, Mr. Keele fails to provide any identification of an objection that should have been made to proceedings at RP p. 221. Mr. Keele does not demonstrate deficient performance and does not undertake to explain how he was prejudiced.

Mr. Keele next contends his lawyer should have contacted county facilities or the Department of Corrections for evidentiary support that Mr. Keele's extensive tattoos on his arms and legs existed before October 2014, to buttress his argument that officers misidentified him. He also argues that his lawyer should have called another witness to corroborate his alibi and should have obtained his work timecard to prove he was at work early on the morning following the chase.

Mr. Keele's testimony that he had the tattoos at the time of the eluding offense was not questioned by the State. Other evidence of the tattoos would have been cumulative and unnecessary. There is nothing in the record to show what another alibi witness would have said or how it would have added to the two witnesses who testified, and nothing to show that an exculpatory work timecard exists. Mr. Keele's remedy, if he has proof that exculpatory evidence exists and he was prejudiced by the failure to present it, is to present the evidence through a personal restraint petition. *See State v. Norman*, 61 Wn. App. 16, 27-28, 808 P.2d 1159 (1991).

11

The same applies to Mr. Keele's next contention: that his trial lawyer provided deficient performance by failing to offer expert testimony on the unreliability of eyewitness identification. If Mr. Keele can prove that an expert witness was available who would have called into question the reliability of the three officers' and Mr. Morris's initial identification of Mr. Keele, he can present it through a personal restraint petition.

*Whether sufficient evidence existed to prove intent.* Mr. Keele argues there was insufficient evidence to prove intent. Intent is a nonstatutory element of assault. *State v. Davis*, 119 Wn.2d 657, 663, 835 P.2d 1039 (1992) (citing analysis in *State v. Hopper*, 118 Wn.2d 151, 158-59, 822 P.2d 775 (1992)). That Mr. Keele must have acted intentionally was conveyed to the jury through the court's use of the pattern instructions. *See* Clerk's Papers at 70 (Instruction 7), derived from 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 35.50, at 581 (4th ed. 2016).

"Where there is no direct evidence of the actor's intended objective or purpose, intent may be inferred from circumstantial evidence." *State v. Bea*, 162 Wn. App. 570, 579, 254 P.3d 948 (2011). A jury may infer criminal intent from a defendant's conduct where it is plainly indicated as a matter of logical probability. *Id.* This includes inferring or permissively presuming that a defendant intends the natural and probable consequences of his or her acts. *Id.*

12

Jurors could reasonably infer intent from evidence that the trooper who had chased Mr. Keele was visibly in Mr. Keele's path when he placed the car in reverse and sped backward. The evidence was sufficient.

*Whether assault in the second degree and malicious mischief in the first degree constituted the same criminal conduct.* Mr. Keele next argues that his convictions for assault in the second degree and malicious mischief in the first degree should constitute the same criminal conduct for sentencing purposes. He did not argue this in the trial court. Whether his two convictions were based on the same criminal conduct presents a factual determination and involves the exercise of discretion, and may not be raised for the first time on appeal. *State v. Nitsch*, 100 Wn. App. 512, 523, 997 P.2d 1000 (2000).

*Jury instruction on intent.* Finally, Mr. Keele argues that the trial court's failure to instruct the jury on the definition of "intent" improperly lowered the State's burden of proof. The defense did not ask the court to define "intent" for the jury.

When intent is an element of the crime, the court must provide its definition if requested, but if no request is made, there is no constitutional error that can be raised for the first time on appeal. *State v. Scott*, 110 Wn.2d 682, 689-90, 757 P.2d 492 (1988) (clarifying and distinguishing *State v. Allen*, 101 Wn.2d 355, 678 P.2d 798 (1984)). We decline to address Mr. Keele's argument for the first time on appeal. *See* RAP 2.5(a).

13

No. 33855-0-III
*State v. Keele*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Fearing, C.J.

_____
Lawrence-Berrey, J.

14