**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | | |
|---|---|---|
| ROSE DAVIS as Personal Representative of the Estate of RENEE L. DAVIS, deceased, | ) ) ) | No. 79696-8-I |
| | ) | |
| Appellant, | ) | DIVISION ONE |
| | ) ) | |
| v. | ) ) | |
| KING COUNTY, a political subdivision of the State of Washington, TIMOTHY LEWIS, Deputy, King County Sheriff's Office, individually and in his official capacity acting under the color of state law; NICHOLAS PRITCHETT, Deputy, King County Sheriff's Office, individually and in his official capacity acting under the color of state law; JOHN URQUHART, in his individual capacity; MITZI JOHANKNECHT, Sheriff, King County Sheriff's Office, in her official capacity; JOHN DOES 1-10, individually and in their official capacities acting under the color of state law, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | ORDER GRANTING MOTION FOR RECONSIDERATION AND PUBLICATION AND ORDER WITHDRAWING AND SUBSTITUTING OPINION |
| | ) | |
| Respondents. | ) ) | |

Appellant Rose Davis filed a motion to reconsider and publish the court's opinion filed on August 31, 2020.  Respondent King County has filed a response.  The panel has determined that the appellant's motion for reconsideration and publication should

be granted and that the opinion filed on August 31, 2020 shall be withdrawn and substituted with a new published opinion.

Now, therefore, it is hereby

ORDERED that appellant's motion for reconsideration and publication is granted and that the opinion filed on August 31, 2020 shall be withdrawn and substituted with a new published opinion.

FOR THE COURT:

_Mann, C.J._

_Chun, J._

_Appelwick, J._

2

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | | |
|---|---|---|
| ROSE DAVIS as Personal Representative of the Estate of RENEE L. DAVIS, deceased, | ) ) ) ) | No. 79696-8-I |
| Appellant, | ) ) | DIVISION ONE |
| v. | ) ) ) | |
| KING COUNTY, a political subdivision of the State of Washington, TIMOTHY LEWIS, Deputy, King County Sheriff's Office, individually and in his official capacity acting under the color of state law; NICHOLAS PRITCHETT, Deputy, King County Sheriff's Office, individually and in his official capacity acting under the color of state law; JOHN URQUHART, in his individual capacity; MITZI JOHANKNECHT, Sheriff, King County Sheriff's Office, in her official capacity; JOHN DOES 1-10, individually and in their official capacities acting under the color of state law, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | PUBLISHED OPINION |
| Respondents. | ) ) ) | |

MANN, C.J. — Washington's felony bar statute, RCW 4.24.420, creates a complete defense to any action for damages for personal injury or wrongful death if the person injured or killed was engaged in the commission of a felony at the time of the

injury or death and the felony was a proximate cause of the injury or death. On its face, the statute applies even if the defendant was negligent or unreasonable.

The estate of Renee Davis appeals the trial court's summary judgment order dismissing its wrongful death action. Davis was fatally shot by law enforcement during a mental health crisis where she was suicidal. On appeal, the estate contends that the trial court erred in granting the defendants' summary judgment motions because the court improperly inferred Davis's specific intent to assault the deputies, made credibility determinations about the deputies' version of events, and because issues of material fact exist as to whether the defendants' negligence was the proximate cause of Davis's death. The estate also contends that the trial court erred because the felony bar statute requires a criminal conviction or admission to felonious conduct before it can bar a wrongful death action. We reverse.

## I. FACTS

On October 21, 2016, T.J. Molina approached King County Sheriff's Office Deputy Nicholas Pritchett on the powwow grounds at the Muckleshoot Indian Reservation during his patrol shift.[1] Molina was worried about his girlfriend, Davis, who had been sending him concerning text messages. Davis had a history of psychiatric treatment for mental illness and history of attempted suicide.

At 6:21 p.m., Davis sent Molina a text message saying "[w]ell come and get the girls or call 911 I'm going to shoot myself." Another text message followed at 6:28 p.m.

---

[1] Davis was a member of the Muckleshoot Indian Tribe. It is common for residents of the Reservation to seek out law enforcement officers for help rather than call 911.

that said "[t]his is to show you I'm not lying," with a blurry photo that appeared to be an injury. It was unclear from the photo the severity and location of the potential injury.

Molina sought out Pritchett's help because Davis had two of her three children with her and was also pregnant with a fourth child. Pritchett was familiar with both Davis and Molina because he had responded to domestic violence incidents at Davis's home concerning Davis's ex-boyfriend. Molina showed Pritchett the text messages from Davis. Pritchett thought the picture could have been an injury or a "photo off the internet," but because the image was blurry, he could not be sure. Molina told Pritchett that Davis had access to a rifle and a handgun.

Pritchett advised dispatch of a "suicidal female, possibly armed with a rifle and who has her two children with her," texting "pictures of fresh injuries, unsure who is injured," and "female is Davis, Renee possibly born in 1993" at 6:37 p.m. Pritchett indicated that he would conduct a welfare check. Dispatch advised Pritchett that backup was approximately 26 minutes away. Pritchett asked dispatch to check if any units from the Auburn Police Department were available to respond. At the same time, Deputy Lewis was commuting home when he overheard Pritchett's radio transmissions and responded. Lewis had been attending a firearms training at the King County Sheriff's Office range.

Pritchett parked a few blocks away from Davis's home at 6:44 p.m. Pritchett approached the home on foot to survey the area and look for signs of distress. Pritchett returned to his vehicle to wait for backup. Lewis arrived at approximately 6:45 p.m. Pritchett quickly told Lewis about a tree he observed outside Davis's residence where

they could shelter if there was gunfire. Lewis knew only what he heard over the radio and did not know that Davis was pregnant or that Pritchett had prior contacts with Davis.

Together, the deputies approached Davis's house on foot at approximately 6:52 p.m. Neither heard any noise from the house or indication that the occupants were in distress. Both deputies loudly knocked on the front door, siding, and windows of the house. They repeatedly yelled "Sheriff's Office!" "It's the police!" and "Come to the door!" to get Davis's attention. Lewis tried to remove the screen from the window when he saw Davis's two children in the living room and asked them to open the front door; Davis's three-year-old child complied. Both children appeared to be under the age of five.

The deputies entered the home, Lewis had his weapon drawn. After quickly assessing the children's well-being, Lewis moved the children to the front door foyer while Pritchett checked the living room and kitchen area. Lewis asked the children "Where's mommy's room?" and one of the children pointed to a door down the hallway. Lewis covered the hallway and the two bedrooms at the back of the hallway while Pritchett approached the first bedroom. The doorknob had a child safety device on it, and Pritchett was unable to maneuver the device because he had on gloves. Pritchett kicked the child safety device off the doorknob.

The deputies entered Davis's bedroom and observed her lying in her bed, covered in a blanket up to her neck, staring blankly at the door. The deputies instructed Davis to show her hands; Lewis recalled that Davis did not respond, while Pritchett recalled that Davis said "no." Lewis pointed his weapon at Davis while Pritchett pulled the blanket off Davis. Both deputies testified that they saw a gun. Lewis recalled that

Davis's right hand was over the top of or below the gun, with the muzzle facing the foot of the bed, while Pritchett recalled that the gun was in Davis's right hand resting on her legs. Both deputies observed a magazine in Davis's left hand, but could not tell whether the gun was loaded or unloaded.

Lewis ordered Davis to "drop the gun," while Pritchett yelled "gun." Pritchett attempted to move back toward the door. Both officers testified that she raised the gun and pointed it directly at them—apparently at the same time. Both Lewis and Pritchett fired their weapons. Three bullets hit Davis. Pritchett announced "shots fired" over the air. Davis slumped over, fell off the bed, and stated "Its not even loaded."

Lewis heard the children screaming and left Pritchett alone in the bedroom with Davis. Lewis encountered Auburn Police Officer, Derek Pederson, as he took the children outside. After removing the children from the home, Pederson and Lewis went back to Davis's bedroom. According to Pederson he saw the gun in Davis's hand while she was lying on the floor and one of the deputies took it out of her hand. Pritchett testified that he told Lewis that they needed to make the scene safe and asked Lewis to cover him while he got the gun. Pritchett claimed he recovered the gun from the bed, checked it, and confirmed that it did not have a magazine nor round in the chamber. He then put the gun in his belt. Lewis testified that he was watching Davis and did not see Pritchett remove the gun from the bed.

Pederson moved the bed away from Davis so that medical personnel could provide treatment. Pritchett called for aid and moved Davis to a location where aid could be provided. Fire department medics, who had been waiting outside entered and performed lifesaving measures. Medics were unable to revive Davis.

On January 3, 2018, the estate filed a wrongful death action against King County, Pritchett, Lewis, former King County Sheriff Urquhart and Sheriff Johanknecht[2] (collectively King County) for negligence, battery, negligent use of excessive force, and outrage. King County moved for summary judgment to dismiss all of the estate's claims based on the felony bar statute, that the deputies had no legal duty to Davis, that Washington does not permit a negligent investigation against police, the deputies' actions were intentional, justified, and reasonable, the facts do not support a claim for battery because the deputies were justified in using deadly force when confronted with a deadly threat, and the elements of outrage could not be met. The estate responded that RCW 4.24.40 required a felony conviction or admission by the plaintiff and that Davis was accused of committing assault in the first degree, which requires specific intent to cause bodily harm or an apprehension of bodily harm. At oral argument, the estate argued that the jury could infer that Davis didn't have the necessary specific intent.

The trial court granted summary judgment in favor of the defendants, concluding that, while there may be disputes of material fact related to the reasonableness of the deputies' conduct, RCW 4.24.420 barred Davis's action. The estate appeals.

## II. ANALYSIS

### A. Intent to Commit Assault

The estate first contends that the trial court erred in granting summary judgment based on the felony bar statute, RCW 4.24.420. It avers that there are questions of material fact over whether Davis had the necessary specific intent to commit a felony assault. We agree.

---

[2] Davis's estate voluntarily dismissed Johanknecht as a defendant.

"We review summary judgment motions de novo, engaging in the same inquiry as the trial court." Vargas v. Inland Washington, LLC, 194 Wn.2d 720, 728, 452 P.3d 1205 (2019). "When reviewing summary judgment motions, we consider all disputed facts in the light most favorable to the nonmoving party." Vargas, 194 Wn.2d at 728 (internal quotes omitted). "Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." CR 56. Estate of Lee v. City of Spokane, 101 Wn. App. 158, 166, 2 P.3d 979 (2000).

The trial court based its order granting summary judgment on the affirmative defense provided by the felony bar statute. RCW 4.24.420 provides that

> [i]t is a complete defense to any action for damages for personal injury or wrongful death that the person injured or killed was engaged in the commission of a felony at the time of the occurrence causing the injury or death and the felony was a proximate cause of the injury or death. However, nothing in this section shall affect a right of action under 42 U.S.C. Sec. 1983.

In order to prevail on the defense provided by RCW 4.24.420, King County bears the burden of demonstrating: (1) that Davis was engaged in the commission of a felony at the time of her death and (2) that the felony was the proximate cause of her death. Camicia v. Howard S. Wright Constr. Co., 179 Wn.2d 684, 693, 317 P.3d 987 (2014) (the party raising affirmative defense bears the burden of proof).

King County asserts that Davis was engaged in either second or third degree assault at the time she was killed. RCW 9A.36.021(1) defines second degree assault, in pertinent part: "[a] person is guilty of assault in the second degree if he or she, under circumstances not amounting to assault in the first degree . . . (c) [a]ssaults another with a deadly weapon." RCW 9A.36.031(1)(g) defines third degree assault, in pertinent part:

"[a] person is guilty of assault in the third degree if he or she, under circumstances not amounting to assault in the first or second degree: . . . (g) Assaults a law enforcement officer or other employee of a law enforcement agency who was performing his or her official duties at the time of the assault."

Because "assault" is not defined in the criminal code, we resort to common law definitions. State v. Abuan, 161 Wn. App. 135, 154, 257 P.3d 1 (2011). Washington recognizes three common law definitions of 'assault': (1) an intentional touching (actual battery); (2) an act done with intent to inflict bodily injury upon another, tending but failing to accomplish it; and (3) an act done with intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury. 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS; CRIMINAL 35.01 (4th ed. 2016) (WPIC); Abuan, 161 Wn. App. at 154 (citing State v. Elmi, 166 Wn.2d 209, 215, 207 P.3d 439 (2009)). Importantly here, specific intent to cause bodily harm or to create apprehension bodily harm is a necessary element of assault. State v. Byrd, 125 Wn.2d 707, 713, 887 P.2d 396 (1995).

"'Intent' to commit a criminal act means more than merely 'knowledge' that a consequence will result." State v. Bea, 162 Wn. App. 570, 579, 254 P.3d 948 (2011). The known or expected result must also be the person's objective or purpose. Bea, 162 Wn. App. at 579. Where there is no direct evidence, intent can be inferred from circumstantial evidence. "A jury may infer criminal intent from a defendant's conduct where it is plainly indicated as a matter of logical probability." Bea, 162 Wn. App. at 579 (citing State v. Myers, 133 Wn.2d 26, 38, 941 P.2d 1102 (1997)).

> While the trier of fact is <u>permitted</u> to draw an inference or presumption that a defendant intends the natural and probable consequences of [their] acts, however, the defendant is entitled to have the jury give equal consideration to the possibility that [they] did not act intentionally, including any theory of nonintentional conduct that [they] might offer.

<u>Bea</u>, 162 Wn. App. at 579-80.

Intent is a question of fact, normally reserved for the jury. "Where intent of the accused is an ingredient of the crime charged, its existence is a question of fact which must be submitted to the jury." <u>Morissette v. U.S.</u>, 342 U.S. 246, 274, 72 S. Ct. 240, 96 L. Ed. 288 (1952) (it is error for the trial court to instruct jury to presume intent). <u>See also</u> <u>Bea</u>, 162 Wn. App. at 579; <u>Wingert v. Yellow Freight Systems, Inc.</u>, 146 Wn.2d 841, 849, 50 P.3d 256 (2002) ("the statute's requirement that the [person] act willfully and with intent presents a question of fact.").[3]

In granting summary judgment, the trial court relied on the testimony of Deputies Pritchett and Lewis, that Davis pointed a weapon at them, to infer her intent to commit felony assault. This was error. As the estate argues, the evidence in the record before us raises numerous questions of fact over whether Davis intended to commit an assault. This evidence includes Davis's history of mental illness and attempted suicide,[4] the deputies' conflicting testimony about where the gun and clip were located, their

---

[3] King County cites <u>Lee</u> for the proposition that "a judge on summary judgment is fully authorized to infer said intent." <u>Lee</u> involved an appeal of a trial court decision dismissing a survivorship action brought under 42 U.S.C. § 1983 against the City of Spokane after a police involved shooting. After concluding dismissal was appropriate, the court went on to address several additional immunity defenses raised by the City. In a short, two sentence discussion at the end of the opinion, the court concluded that RCW 4.24.420 provided the City a defense because "[b]y the plaintiff's own account, Mr. Lee pointed a gun at Officer Langford and Ms. Lee after threatening to shoot them. This is first degree assault, a felony." The court did not discuss intent, much less, conclude that intent could be inferred by the trial court on summary judgment.

[4] Evidence of diminished capacity is admissible to prove or disprove that a defendant was capable of forming the requisite specific intent to commit a crime. <u>State v. Poulsen</u>, 45 Wn. App. 706, 708, 726 P.2d 1036 (1986).

testimony that she pointed the gun at each of them—apparently at the same time, Davis's dying statement that "Its not even loaded," and the conflicting testimony whether the gun was found in Davis's hand on the floor, or still on the bed. While a jury might find the officers' testimony credible and Davis's act of pointing the gun demonstrates her intent to commit an assault, it might also conclude to the contrary. The trial court erred in concluding Davis had the requisite specific intent to commit assault.[5]

### B. Conviction or Admission

While we reverse and remand for trial, we also address the estate's alternative argument that the trial court erred in granting summary judgment under RCW 4.24.420 because there must be a felony conviction or admission to felonious conduct before the court can bar a wrongful death action under RCW 4.24.420. We disagree.

We review statutory interpretation de novo. Tesoro Ref. & Mktg. Co. v. State, Dep't of Revenue, 173 Wn.2d 551, 556, 269 P.3d 1013 (2012). "The primary objective of any statutory construction inquiry is to ascertain and carry out the intent of the Legislature." Tesoro, 173 Wn.2d at 556. First, we look to the statute's plain language and if the language is unambiguous, our inquiry ends. State v. Armendariz, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). "The statute is to be enforced in accordance with its plain meaning." Armendariz, 160 Wn.2d at 110. "Where the plain language of the statute is subject to more than one reasonable interpretation, it is ambiguous." When a statute's language is ambiguous, we may resort to legislative history to discern legislative intent. Armendariz, 160 Wn.2d at 110-11.

---

[5] Because we reverse and remand for trial, we do not address the estate's argument that there was a question of fact over whether Davis's actions were the proximate cause of her death.

Here, the statute's language is unambiguous. The plain language of the statute does not require that a person be convicted of a felony or admit to felonious conduct before RCW 4.24.420 is a complete defense to a civil action. Instead, the language states "[i]t is a complete defense to any action for damages for personal injury or wrongful death that the person injured or killed <u>was engaged in the commission of a felony</u>." RCW 4.24.420 (emphasis added). A wrongful death action will likely never involve a conviction or admission to felonious conduct because the death would proceed any possible trial or admission. When possible, we "give effect to every word, clause and sentence of a statute." <u>Cox v. Helenius</u>, 103 Wn.2d 383, 387, 693 P.2d 683 (1985). The argument advanced by the estate reads the language "wrongful death" out of the statute by making the defense unavailable in almost all wrongful death actions. We read the statute to specifically contemplate its applicability in wrongful death actions.

We reverse the trial court's order granting summary judgment based on RCW 4.24.420.

_____
Mann, C.J.

WE CONCUR:

_____                    _____
Chun, J.                                      Appelwick, J.

-11-