[No. 12855. Department Two. February 2, 1916.]

THE STATE OF WASHINGTON, *Respondent*, v. JOHN HAWKINS, *Appellant*.[1]

HOMICIDE—MALICE— "PREMEDITATED DESIGN" — EVIDENCE — SUFFI-CIENCY—BURDEN OF PROOF. A conviction of second degree murder is sufficiently supported by evidence of malice or "premeditated design to effect the death," within Rem. & Bal. Code, § 2392, where defendant started an affray by rushing up to the deceased and others and charged someone with cutting his hog, and on this being denied, with lying, and after being struck by the deceased, drew or produced a revolver which he might have had concealed in his hand, and shot the deceased while deceased was retreating after being requested by deceased and another not to shoot, and shot again and killed the deceased while others were trying to disarm him; especially in view of the rule that, the killing being admitted, the burden of justifying the act or reducing the crime to manslaughter is upon the accused.

CRIMINAL LAW—APPEAL—REVIEW—INSTRUCTIONS—REQUESTS—NE-CESSITY—HOMICIDE. Upon a prosecution for homicide, an instruction admittedly correct as far as it goes upon the subject of the deceased's first attack and retreat, cannot be complained of as failing to state all that accused was entitled to on the subject of self-defense and defendant's knowledge of the retreat, where no request was made for any instruction of that nature.

HOMICIDE—SELF-DEFENSE — PROVOKING ASSAULT — FAILURE TO DE-SIST. One who starts a fatal affray by conduct provoking an assault, and was struck, is not justified in shooting his assailant in self-defense, after his assailant had retreated and he was requested not to shoot, and where he afterwards fired again and killed the deceased while being disarmed by others; as it was his duty to retreat or at least desist.

Appeal from a judgment of the superior court for Whitman county, McCroskey, J., entered February 24, 1915, upon a trial and conviction of murder in the second degree. Affirmed.

*Charles R. Hill*, for appellant.

*R. M. Burgunder* and *Thomas Neill*, for respondent.

[1]Reported in 154 Pac. 827.

PARKER, J.—The defendant, John Hawkins, was charged, by information filed in the superior court for Whitman county, with the crime of murder in the first degree, in that he did, on the 29th day of November, 1914, "feloniously and with premeditated design to effect the death of one George A. Miller, kill and murder said George A. Miller." His trial before the court and a jury resulted in a verdict of guilty of murder in the second degree against him. Judgment was rendered thereon sentencing the defendant to the penitentiary, from which judgment he has appealed to this court.

Appellant and deceased were neighboring farmers living in Whitman county. On Sunday, November 29, 1914, appellant had been hunting, carrying a rifle and revolver. On returning home near evening, he found some of his hogs missing. He also discovered during the day that his boar had been castrated by some one. He started out hunting for his missing hogs. He came to Miller's place about five o'clock in the evening, evidently in an angry mood. He carried his revolver with him. Whether it was purposely concealed on his person is not very clear from the evidence, but that it was not seen by the witnesses present at the time of the shooting until it was actually drawn by him immediately preceding the shooting, seems plain. Miller was in his barn feeding his horses. Two of his neighbors, Roberts and Hall, were there talking to him, evidently as mere visitors. Roberts' testimony as to what occurred upon appellant's arrival is as follows:

"A. He [Miller] was feeding his horses and me and Mr. Hall was standing talking to him, and John Hawkins dashed into the door and ran up where we were at and Mr. Miller says, 'Hello John,' and he says, 'What the hell's the matter with you fellows,' and Mr. Miller says, 'Nothing, John, what's the matter with you?' and he says, 'What did you cut my hog for?' and Mr. Miller says, 'I never cut your hog, John,' and he turned to me and says, 'Did you?' and I says, 'No,' and then he says, 'There is a dam lie between you fellows somewhere,' and I says, 'Do you mean me, John?' and he

says, 'No,' and Mr. Miller says, 'You mean me, John?' and
no he didn't say anything and Mr. Miller says so again and
again and he didn't say anything and Mr. Miller tapped him
with his fist and says, 'You mean me?' and he said—  Q.
What kind of a blow did he strike him?  A.  Like that (indi-
cating), a kind of side strike, in the temple on this side (in-
dicating).   Then Hawkins drew a gun and Mr. Miller he
went running back and hollowing for him not to shoot, and
Mr. Miller ran back eight or nine feet and Hawkins followed
him about eight feet before firing and Mr. Miller was just
running in behind Mr. Hall and he fired just then, and he
had backed up along beside of me and was drawing his gun
toward me and I knocked the gun back and he shot at me as
he turned round to his left and we scuffled there and while
we was scuffling Mr. Miller stepped over against the hay
and Hawkins kept on scuffling towards him and when he got
up to two or three feet drew his gun up in Mr. Miller's
breast and shot him.   Then we got the gun away from him
and held him until the sheriff come.  Q.  What was the ef-
fect of those two shots on Mr. Miller?  A.  How did it af-
fect Mr. Miller?  Q.  Yes.  A.  Well, the first shot I couldn't
tell that it affected him very much only he just leaned against
the hay and hollowed the first shot, 'He shot me,' and the
last shot killed him.  Q.  How long did he live after the last
shot?  A.  I should judge half a minute, something like that."

Hall's testimony is substantially to the same effect, as fol-
lows:

"A.  Well, I, Mr. Roberts and Mr. Miller were in the barn
at Mr. Miller's place and Mr. Miller was feeding the horses.
Mr. Hawkins came in the barn and replied, 'Who of you, —,'
he said first, 'What the hell's the matter with you fellows?'
Mr. Miller says, 'Nothing, what's the matter with you,
John?'   John says, 'Who of you fellows cut my hog?'  Mr.
Miller says, 'It wasn't me.'   Then he turned around to Mr.
Roberts and asked him, and he says, 'It wasn't me either,
John.'   Mr. Hawkins says, 'There is a damn lie out among
you fellows.'   And Mr. Roberts was standing a little closer
than Mr. Miller and Mr. Roberts says, 'Do you mean me,
John?' and he says, 'No.  I didn't mean you.'  And Mr.
Miller made the same reply and he made no answer.   He
walked around to him and asked him again and he made no

reply and Mr. Miller struck him with his fist and staggered him over a little ways against a sack pile there. Mr. Hawkins raised with his gun in his hand. Mr. Miller asked him not to shoot and I asked him the same thing and Mr. Roberts also. He didn't hesitate but shot Mr. Miller. Mr. Miller walked around behind me. At the time he put the first shot into Mr. Miller he was standing pretty near behind me. Then he turned around the second shot and shot at Mr. Roberts, and Mr. Roberts grabbed hold of him and turned him kind of around and then the last shot, the next shot he fired at Mr. Miller again. As soon as he done it Mr. Miller replied, 'He has killed me.' By that time Mr. Roberts got hold of Hawkins and succeeded in taking the gun away from him. I held Mr. Hawkins then and Mr. Roberts went to phone for the sheriff. While he was gone to phone for the sheriff I asked him, 'Why did you do that?' and he says, 'I don't know what in the world I done it for. I didn't have a thing against you fellows. I just got mad and lost my head.' . . . Q. When he come in did you notice the position of his hands before the shot was fired? A. Yes, sir, he had them under his sweater coat. Q. Which hand? A. The right hand. Q. What position was his left hand? A. Swinging down by his side. Q. When Miller struck him what kind of a blow did he hit? A. Kind of a side blow. Q. Whereabouts did he strike him? A. On the left side of his face. Q. You say he staggered him? A. Yes, sir, some, over against a sack pile in the barn. Q. When did you first see the revolver in his hand? A. He was just about straightened up when I seen the revolver. He almost had it leveled when I noticed it. Q. When was the first time you saw his right hand when he come in the barn? A. Just as I looked around at him. I took a minute at that time to notice what he was going to do. Q. When was the first time after he came in the barn that you saw his right hand? A. Not until he pulled the gun. Q. At the time he pulled the gun where was Miller? A. Stepping back behind me, kind of. Asking him not to shoot him. . . . Q. How far was Hawkins from Miller when the first shot was fired? A. Well, about eight feet. Q. How far was he away at the time the second shot was fired? A. Well, I should judge about three or four feet."

The jury was fully warranted by the evidence in believing, as it evidently did, that these versions of the affray given by Roberts and Hall in their testimony were substantially correct, and that it was light enough there to readily distinguish the action of each one present; though appellant in his testimony insists that it was dark at the time; that he did not know that Miller was in fact retreating, and believed that some one was actually assaulting him at the time he fired the shots.

It is contended by counsel for appellant that the trial court erred in refusing to withdraw from the consideration of the jury the charges of murder in both the first and second degrees and submit to the jury only two forms of verdict: one, "Not guilty," and another, "Guilty of manslaughter," so that the jury would have no alternative but to find in one or the other of these two forms. The substance of this contention is that there was not sufficient evidence of malice to warrant the jury finding the appellant guilty of murder in either the first or second degrees. It seems to us, however, that the facts above noticed, which the jury were clearly warranted in believing, fully answer this contention; especially in view of the general rule recognized by this and other courts as stated in *State v. Drummond*, 70 Wash. 260, 263, 126 Pac. 541, as follows:

"The killing being admitted or proved beyond a doubt to have been done by the appellant, the burden of justifying his act or reducing the crime to that of manslaughter was upon him. *State v. Ware,* 58 Wash. 526, 109 Pac. 359; *State v. Clark,* 58 Wash. 128, 107 Pac. 1047, and cases there cited."

Indeed, even aside from this rule, the evidence seems ample to support the conclusion reached by the jury, so far as the question of malice is concerned, in view of the frame of mind in which appellant arrived upon the scene, his possession of the revolver which the jury might well have believed was concealed, and his manner of addressing those present imme-

diately preceding the shooting. It seems quite plain to us that the trial court was amply justified in submitting to the jury at least the question of appellant's guilt of murder in the second degree.

It is contended in appellant's behalf that the trial court, in any event, erred in refusing to withdraw from the jury the question of appellant's guilt of murder in the first degree, an instruction to that effect having been requested and refused. This contention we think finds its answer in the fact that appellant was not found guilty of murder in the first degree, but was acquitted thereof by the finding of his guilt of murder in the second degree. The argument seems to be that there was not sufficient evidence of premeditated malice or "premeditated design to effect the death" of Miller, using the language of Rem. & Bal. Code, § 2392 (P. C. 135 § 279), defining murder in the first degree, to warrant the submission of that question to the jury. Were we to so hold, as a matter of law, still appellant having been acquitted of that degree of murder, the denial of the request for withdrawal of that question from the jury proved not to be prejudicial to his rights. The following decisions support this view: *State v. Underwood,* 35 Wash. 558, 77 Pac. 863; *State v. Phillips,* 59 Wash. 252, 109 Pac. 1047; *State v. Blaine,* 64 Wash. 122, 116 Pac. 660; *Downing v. State,* 11 Wyo. 86, 70 Pac. 833, 73 Pac. 758.

The trial court instructed the jury in part as follows:

"You are instructed that although you may believe from the evidence that deceased struck the defendant with his fist, and thereby made the first attack, still, if you further believe from the evidence that the deceased after such attack, and before the fatal shot was fired, ceased his attack upon defendant and in good faith withdrew from the conflict by retreating or otherwise, then the defendant would not be justified in taking the life of the deceased after the deceased, if you so find, had withdrawn from the conflict."

Counsel for appellant make but little contention against the correctness of this as a statement of the law; but urge

that the instruction does not state all upon that subject which appellant was entitled to in view of the theory of his defense, which is that he was acting in self-defense; that it was not light enough in the barn for him to see or know that Miller was retreating; that he was being attacked by some of those present; that he did not know just which one it was because of the want of sufficient light and the confusion; and that he shot without intent to injure any one other than those he thought were actually attacking him at the time he shot. The complaint of appellant's counsel against the instruction seems to be that it fails to take account of his theory of the defense, in that it makes no mention of what appellant's rights might be in the light of his want of knowledge of Miller retreating. We note that counsel for appellant made no request for any instruction of this nature. We therefore think he is not in position to complain of the instruction above quoted, since it seems to clearly state the law generally applicable to such cases.

While appellant may not have been the aggressor in the sense of striking the first blow, he manifestly was the aggressor in the sense that his actions brought on the affray, if the versions given by Roberts and Hall are to be believed, as the jury had the right to believe them. In the text of 21 Cyc. 807, touching the question of what constitutes one an aggressor in such an affray, it is said:

"Any wrongful or unlawful act of the accused which is reasonably calculated to lead to an affray or deadly conflict, and which provokes the difficulty, is an act of aggression or provocation which deprives him of the right of self-defense, although he does not strike the first blow. So one is the aggressor where he provokes another into a quarrel causing a fatal affray, or commences an assault upon the other. The act of provocation must have been committed at the time the homicide occurred, and must have related to the assault in the resistance of which the assailant was killed."

These observations seem to be well supported by the authorities. This view of the law, as applied to the facts of this case, would argue strongly against appellant's right of self-defense. In any event, he was not justified in following up the affray rather than retreating or at least desisting, in the light of the facts which the jury were warranted in believing, and evidently did believe. 21 Cyc. 820.

It seems quite plain to us that this record shows no prejudicial error against appellant, and that he has been awarded a fair trial.

The judgment is affirmed.

MORRIS, C. J., MAIN, BAUSMAN, and HOLCOMB, JJ., concur.