IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of | ) | |
| | ) | No. 34808-3-III |
| MERLE WILLIAM HARVEY, | ) | |
| | ) | PUBLISHED OPINION |
| Petitioner. | ) | |

SIDDOWAY, J. — Merle Harvey seeks relief from personal restraint resulting from his 2010 convictions for first degree murder, second degree murder, and two counts of unlawful possession of a firearm. He claimed self-defense at trial and contends he received ineffective assistance of appellate counsel when his lawyer on direct appeal failed to assign error to the trial court's refusal to instruct jurors that he had no duty to retreat.

His petition fails for either of two reasons. First, there was insufficient evidence that Mr. Harvey had a right to be in the private parking lot of an apartment complex where he shot the two victims.

Second, he persuaded the trial court not to give a first aggressor instruction that the State requested and that, while not necessary, was supported by the evidence. The

trial court accepted his contention that both sides would be able to argue their theories to the jury without a first aggressor instruction. By placing his strategic priority on avoiding a jury determination whether he was the first aggressor, Mr. Harvey waived his right to an instruction that would not apply if he *was* the first aggressor. The petition is dismissed.

## PROCEDURAL HISTORY

*Convictions, appeal, and the present petition*

In late September 2009, Merle Harvey shot and killed Jack Lamere and Jacob Potter. The State charged him with two counts of first degree murder and two counts of unlawful possession of a firearm. Mr. Harvey admitted that he shot the men, but claimed he did so in self-defense. The jury found him guilty of the first degree murder of Mr. Lamere, the second degree murder of Mr. Potter, and both charges of unlawfully possessing a firearm. On appeal, this court affirmed.[1] After Mr. Harvey successfully petitioned the Supreme Court to permit supplementation of the record, the matter was remanded, briefed and argued further, and Mr. Harvey's convictions were again affirmed.[2]

In a timely personal restraint petition, Mr. Harvey now argues that his appellate

---

[1] *State v. Harvey*, noted at 167 Wn. App. 1026 (2012).
[2] *State v. Harvey*, No. 29513-3-III (Wash. Ct. App. June 10, 2014) (unpublished), https://www.courts.wa.gov/opinions/pdf/295133.cor.pdf.

counsel was ineffective for failing to assign error to the trial court's refusal to give a "no duty to retreat" instruction requested by his trial lawyer.

*Relevant trial evidence, jury instruction proposals, and objections*

It was undisputed that what precipitated the killing of Mr. Lamere and Mr. Potter was Mr. Harvey's effort on a fall evening in 2009 to reclaim a Chevrolet Blazer from Mr. Lamere in the parking lot of the apartment complex where Mr. Lamere's girlfriend lived. Several months earlier, Mr. Harvey and Mr. Lamere exchanged vehicles, with Mr. Harvey obtaining a Cadillac from Mr. Lamere and Mr. Lamere obtaining Mr. Harvey's Blazer. Mr. Harvey's version of the exchange was that he had only agreed with Mr. Lamere to test drive each other's vehicles but that Mr. Lamere took off with the Blazer and refused to return it, leaving Mr. Harvey with a Cadillac with mechanical problems that he did not want.

On the evening Mr. Lamere and Mr. Potter were shot, Mr. Harvey and his girlfriend, Diane Richardson, drove around in Mr. Harvey's flatbed pickup truck looking for the Blazer. At around 9:00 p.m., the pair found Mr. Lamere and the Blazer in the parking lot of the apartment complex where Mr. Lamere's girlfriend was a tenant. Ms. Richardson, who was driving the flatbed truck, pulled into the lot.

Only two eyewitnesses to the shooting that followed testified at trial: Mr. Harvey and Lori Averill, a tenant at the apartment complex who was sitting outside near where the shooting occurred. Hiram Michel, also a tenant, testified to events he saw before the

3

shooting and after he emerged from his apartment later and heard shots being fired. A

Spokane police detective, Chet Gilmore, testified to what Mr. Harvey told him several

weeks following the shooting, after Mr. Harvey had been located and agreed to make a

statement.

Viewed in the light most favorable to Mr. Harvey, the evidence showed the

following:

- Mr. Harvey never traded vehicles with Mr. Lamere but was only the victim of Mr. Lamere tricking him into test driving each other's cars, only to drive off with Mr. Harvey's Blazer;

- Mr. Harvey wanted his Blazer back, so when he and Ms. Richardson came across Mr. Lamere in the parking lot of the apartment complex where Mr. Lamere's girlfriend lived, they decided to approach him about obtaining the return of the Blazer;

- The only reason Mr. Harvey had two rifles in his flatbed truck on the day he came across Mr. Lamere was because he had gone target shooting that afternoon;

- After speaking with Mr. Lamere and learning of his insistence that the Cadillac be delivered, Ms. Richardson left and borrowed a phone to arrange for someone to deliver it, reporting to Mr. Lamere on her return that it was on its way as requested;

- While Ms. Richardson was gone, Mr. Harvey (who remained seated in the flatbed truck) saw Mr. Lamere and Mr. Potter (who was in the parking lot with Mr. Lamere when Mr. Harvey and Ms. Richardson arrived) whispering in what he believed to be a menacing way;

- Mr. Harvey knew that Mr. Lamere was a violent and dangerous person, so the conduct of Mr. Lamere and Mr. Potter made him fearful;

- Mr. Harvey assembled and loaded one of his rifles for the protection of himself and Ms. Richardson;

- Mr. Harvey saw Mr. Potter rummaging for something in the back seat of his truck and believed he grabbed a gun and put it in his waistband;

- After Ms. Richardson returned from making a phone call, she resumed her position in the driver's seat of the flatbed truck and she, not Mr. Harvey, pulled it forward to block Mr. Lamere from leaving in the Blazer;[3]

- Mr. Lamere was slamming doors and yelling angrily while Mr. Harvey attempted to explain that someone was bringing the Cadillac; and

- Mr. Harvey did not begin firing on Mr. Lamere and Mr. Potter until he saw them and a third man moving toward his truck, reaching for guns in their waistbands, causing him to fear for his and Ms. Richardson's lives.

Viewed in the light most favorable to the State, the evidence showed the following:

- Mr. Harvey had Mr. Lamere's Cadillac and Mr. Lamere had Mr. Harvey's Blazer for a couple of months before the shooting, during which Mr. Harvey had sometimes acknowledged to trial witnesses that the two men had made a trade. But witnesses were also aware that Mr. Harvey was unhappy about the trade and had pressed Mr. Lamere to return the Blazer;

- Mr. Harvey was very angry on the day of the murders about Mr. Lamere's refusal to return the Blazer and left an angry and profane voicemail message for a friend of Mr. Lamere's that was played to jurors;

- Mr. Harvey knew that Mr. Lamere was violent and had seen him act violently with little provocation;

- Mr. Harvey, who had previously been convicted of a serious offense and could not legally possess a firearm, took two rifles with him when he went looking for Mr. Lamere and the Blazer;

- One of the rifles was already loaded when Mr. Harvey and Ms. Richardson arrived at the parking lot and Mr. Harvey assembled and loaded the other while Ms. Richardson was off making a phone call to arrange for delivery of the Cadillac;

---

[3] Detective Gilmore testified that Mr. Harvey admitted when providing a statement that he instructed Ms. Richardson to pull the flatbed truck forward and block Mr. Lamere. But in his own trial testimony, Mr. Harvey repeatedly pointed out that it was Ms. Richardson, not he, who pulled the truck forward. He did not deny telling Detective Gilmore that she blocked the Blazer on his instruction.

- When Ms. Richardson returned and told Mr. Lamere the Cadillac was coming, Mr. Lamere told her and Mr. Harvey that they had a done deal and he wanted them to "get out of [ ]here." Report of Proceedings (RP) at 349;

- When Mr. Lamere then got into the Blazer, Mr. Harvey told Ms. Richardson to pull the flatbed truck forward and "pin Mr. Lamere in so he couldn't drive that Blazer out of there," RP at 850, which she did;

- After blocking Mr. Lamere from leaving in the Blazer, Mr. Harvey then stepped out of the truck angrily, said, "[G]et that f***ing truck," or he was "taking the f***ing truck . . . right now," and said he "was done with [Mr. Lamere] ripping people off." RP at 351-52, 355. He then reached into his truck, retrieved his gun, and shot Mr. Lamere and then Mr. Potter; and

- Mr. Lamere was carrying a gun in his waistband but had not drawn his gun or pointed it at Mr. Harvey or Ms. Richardson, and Mr. Potter, who had been looking for a tool in his truck when the shooting started, proved to be carrying a pistol-grip flashlight, not a gun, when he was shot.

The State did not contest Mr. Harvey's right to having the jury instructed on self-defense, but proposed that jurors also be given a first aggressor instruction.

The record is clear that in arguing how the jury should be instructed, Mr. Harvey's priority was to avoid the giving of a first aggressor instruction. At the outset of trial, he filed a brief opposing the giving of the instruction, arguing that first aggressor instructions "are not favored by Washington Courts." Clerk's Papers (CP) at 181. He quoted this court's 1985 decision in *State v. Arthur*, 42 Wn. App. 120, 125 n.1, 708 P.2d 1230, which stated, "[F]ew situations come to mind where the necessity for [a first] aggressor instruction is warranted. The theories of the case can be sufficiently argued and understood by the jury without such instruction." *Id.*

Argument over the giving of the first aggressor instruction was protracted. Over 40 pages of the verbatim report of proceedings reflect the court's consideration of Mr. Harvey's objections to the first aggressor instruction. The trial court first heard argument over the giving of the instruction on the afternoon before the case was submitted to the jurors. The court observed, "Sometimes it's kind of hard to know where to go on these cases where you've got the aggression coming from both sides." RP at 1130. The court was persuaded that afternoon that it should give the instruction. It explained:

> [I]n this case, you've got this incredibly volatile situation. You've got Mr. Harvey on the day of this incident ranting over the phone, angry, belligerent about this car. . . . [T]here is evidence that he's driving around looking, you know. He's looking for Jack Lamere. He's looking for his Blazer. . . . I think the issue here is going to be is this behavior on the part of Mr. Harvey that wasn't perhaps pulling the gun first still sort of aggressive enough that it created this belligerent response in [Mr.] Lamere.
> Certainly, Mr. Harvey knew it didn't take a lot, according to the evidence . . . it didn't take a lot to provoke Jack Lamere. And Mr. Harvey is . . . out of control. He's positioning his truck so Mr. Harvey can't get out—or Mr. Lamere can't get out.
> . . . .
> So again, the issue here is was Mr. Harvey using more than his words. And I have to find that he was, and I think it's an appropriate case for the first aggressor instruction. . . .
> Giving the first aggressor instruction, I think, is helpful to the jury in this particular case because of these particular circumstances. It allows the State to argue its side of the case. It allows the defense to argue its side of the case. It just gives the jury a little more assistance.

RP at 1133-34.

Following the ruling, defense counsel argued that giving the first aggressor instruction would create a need to give further instructions; for instance, it would require

an instruction that words alone do not make one a first aggressor. The trial court told defense counsel to research any problems created by giving the instruction and it would entertain further argument in the morning.

Later that same afternoon, there was discussion of Mr. Harvey's proposed "no duty to retreat" instruction—WPIC[4] 16.08. Discussion of WPIC 16.08 was brief. When the trial court questioned Mr. Harvey's lawyer about whether the instruction applied, he responded "I do. I am requesting it. I would object to not giving it." RP at 1188-89. He did not elaborate further.

Asked to respond, the prosecutor stated,

I don't believe this one is appropriate under the facts of this case. The facts in this case indicate Mr. Harvey went to where Mr. Lamere resided and confronted him at that place. *I don't believe that he had a right necessarily to be there* at that home of Mr. Lamere.

RP at 1189 (emphasis added). The prosecutor conceded, however, that the no duty to retreat instruction should be given if the first aggressor instruction was given and the court agreed. Defense counsel's only further argument that Mr. Harvey had a right to be in the apartment parking lot was that Mr. Lamere, who was only a visitor to the apartment complex, had no right to order him to leave.

---

[4] Washington Pattern Instruction: Criminal. WPIC 16.08 can be found at 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL, 16.08, at 263 (4th ed. 2016).

The following morning, Mr. Harvey made further arguments against the giving of a first aggressor instruction. He told the court, "To give this instruction is a comment upon the evidence and it's likely to cause [Mr. Harvey] to have an unfair trial. We'll be right back here in a couple of years." RP at 1212. The court conceded, "I worry about giving the aggressor instruction. But I also worry about not giving it." RP at 1216.

After hearing from both parties, the trial court said, "Okay. I'm going to reverse myself and not give the first aggressor instruction." RP at 1229. The court made clear that it was persuaded by defense counsel that *not* giving the instruction was the conservative way to go. The trial court explained:

> [I]f I make a mistake, and I think this is a real borderline issue on both sides, if I make a mistake and I give the aggressor instruction . . . and if there is a conviction, there is a fairly significant chance I would be reversed. If I make a mistake the other way and I don't give the aggressor instruction, and there is a conviction, nobody is going to reverse on that. . . . I hate to put it in such crass terms. I think there is a bigger pothole here if I give the instruction.
> I still think it's a real close call.

*Id*.

Immediately after this ruling, the prosecutor stated that because the trial court's decision to give the no duty to retreat instruction had gone hand in hand with giving the first aggressor instruction, the no duty to retreat instruction should be stricken. Asked to respond, defense counsel stated only, "State says someone held at gunpoint, judge," and began to explain that the apartment complex manager had testified that Mr. Lamere was

not himself a tenant, but the guest of a tenant.[5] RP at 1230. The court ruled it would not give either the first aggressor or no duty to retreat instructions. Mr. Harvey later made formal objection to the court's refusal to give the no duty to retreat instruction, but never argued any other reasons why refusal to give the instruction was error.

Mr. Harvey appealed. He did not argue in his brief on appeal or his statement of additional grounds that the trial court erred by refusing to give a no duty to retreat instruction. The argument is raised for the first time in this timely personal restraint petition.

## ANALYSIS

Mr. Harvey argues that his appellate counsel provided ineffective representation by failing to assign error to the trial court's refusal to give his proposed no duty to retreat instruction.

To obtain relief in a personal restraint petition, Mr. Harvey must show actual and substantial prejudice resulting from alleged constitutional errors or, for alleged nonconstitutional errors, a fundamental defect that inherently results in a complete miscarriage of justice. *In re Pers. Restraint of Cook*, 114 Wn.2d 802, 813, 792 P.2d 506 (1990). Ineffective assistance of counsel constitutes constitutional error. *Cf. State v.*

---

[5] On the latter point, defense counsel said only, "[H]e also was under no burden to leave because Mr. Mashtare, the manager—" before being cut off. RP at 1230. We infer that defense counsel's point was going to be that Mr. Lamere was not himself a tenant and could not order anyone to leave.

*Thomas*, 109 Wn.2d 222, 229, 743 P.2d 816 (1987) (right to effective assistance of counsel is constitutionally guaranteed by the Sixth Amendment to the United States Constitution and Washington Constitution art. I, § 22). Where a petitioner demonstrates ineffective assistance of counsel, the demonstration of the prejudice required for that claim satisfies the actual and substantial prejudice required for collateral relief. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012). To establish a claim of ineffective assistance of appellate counsel, the petitioner must demonstrate (1) the merit of the legal issue appellate counsel allegedly failed to raise, and (2) how he was prejudiced. *In re Pers. Restraint of Netherton*, 177 Wn.2d 798, 801, 306 P.3d 918 (2013).

For two independently sufficient reasons, Mr. Harvey does not demonstrate the merit of the instructional issue his appellate lawyer allegedly failed to raise.

### *A no duty to retreat instruction was not supported by trial evidence that Mr. Harvey had a right to be in the private parking lot*

In Washington, there is no duty to retreat when a person is assaulted in a place where he has a right to be. *State v. Studd*, 137 Wn.2d 533, 549, 973 P.2d 1049 (1999). The trial court should instruct the jury to this effect when sufficient evidence supports it. *State v. Allery*, 101 Wn.2d 591, 598, 682 P.2d 312 (1984). Where a defendant is assaulted at his or her home or in a public place, the right to be there is clear. Whether Mr. Harvey had a right to be in the private parking lot of the apartment complex where

11

Mr. Lamere's girlfriend lived is not clear, and requires review of the right of a possessor

of land to be free from intrusion and the corresponding limits on the rights of others to

enter.

A trespass is an intrusion onto the property of another that interferes with the

other's right to exclusive possession. *Bradley v. Am. Smelting & Ref. Co.*, 104 Wn.2d

677, 690-91, 709 P.2d 782 (1985); RESTATEMENT (SECOND) OF TORTS § 158 (AM. LAW

INST. 1965). Conduct that would otherwise constitute a trespass is not a trespass if it is

privileged. *Id.* at § 158, cmt. e. A privilege may derive from the consent of the possessor

or may be given by law because of the purpose for which the actor acts. *Id.*

Mr. Harvey shot Mr. Lamere and Mr. Potter in the parking lot of the Boone Street

Apartments in Spokane. Washington law provides that landlords and tenants possess

joint control over the common areas of a multiunit dwelling. *City of Bremerton v. Widell*,

146 Wn.2d 561, 571, 51 P.3d 733 (2002). Under Washington common law, a

nonresident must be licensed to enter the common areas of a multiunit dwelling and the

incursion must fall within the scope of that license. *Id.* at 573. Neither Mr. Harvey nor

Ms. Richardson had an ownership interest in the Boone Street Apartments and neither

was a tenant. There was no evidence that anyone with a possessory interest had expressly

invited them into the parking lot for any purpose.

In addition to giving express consent to entry, the possessor of property may

impliedly consent to a licensee's entry, through conduct or by application of local

12

custom. *Singleton v. Jackson*, 85 Wn. App. 835, 839-40, 935 P.2d 644 (1997) (citing

RESTATEMENT at § 330).  One implied license recognized by common law is a

homeowner's implied license to third parties to approach a front door and knock in an

attempt to make contact for a customary purpose. *State v. C.B.*, 195 Wn. App. 528, 538-

41, 380 P.3d 626 (2016) (citing *Florida v. Jardines*, 569 U.S. 1, 8, 133 S. Ct. 1409, 185

L. Ed. 2d 495 (2013)).  "This implicit license typically permits the visitor to approach the

home by the front path, knock promptly, wait briefly to be received, and then (absent

invitation to linger longer) leave." *Jardines*, 569 U.S. at 8.  There is no evidence in the

trial record of any conduct or custom that would imply consent by the owner or a tenant

of the Boone Street Apartments for Mr. Harvey or Ms. Richardson to enter the parking

lot.  The couple had no business to conduct, personal or otherwise, with any tenant.  As

Mr. Harvey took pains to point out, Mr. Lamere was only the guest of a tenant.

Finally, a person whose chattel is located on another's land without his consent

and not as a result of his tortious conduct or contributory negligence is privileged to enter

the land at a reasonable time and in a reasonable manner to remove the chattel.

RESTATEMENT at § 198.  The right of entry exists only in a person who is entitled to the

immediate possession of the chattel. *Id.*  And entry in a reasonable manner ordinarily

requires the person to first make a demand on the possessor of the land to deliver the

chattel or to permit entry. *Id.* at cmt. d.  The only exceptions to the demand requirement

13

are if it appears that a demand will be futile or that delay will subject the chattel to a danger of serious harm. *Id.*

No Washington decision discusses this common law privilege to remove a chattel, but cases from other jurisdictions have adopted the *Restatement*'s articulation of the privilege and its limits. *See, e.g.*, *Mortensen v. LeFevre*, 674 P.2d 134 (Utah 1983); *Salisbury Livestock Co. v. Colo. Cent. Credit Union*, 793 P.2d 470 (Wyo. 1990). In trespass cases, our Supreme Court and this court have frequently adopted the *Restatement* as correctly stating the law as it pertains to privileges to enter land. *E.g.*, *Brutsche v. City of Kent*, 164 Wn.2d 664, 674, 193 P.3d 110 (2008) (adopting Section 214, dealing with an actor's liability for exercising a privilege to enter land in an unreasonable manner); *Applegate v. Lucky Bail Bonds, Inc.*, 197 Wn. App. 153, 155, 387 P.3d 1128 (2016) (holding that Sections 205 and 206 correctly state a bail bondsman's privilege to enter land and dwellings); *Widell*, 146 Wn.2d at 572 & n.2 (approving of Section 189 and its comment c, dealing with a tenant's privilege of entry and the privilege of those who enter in the tenant's right); *Peters v. Vinatieri*, 102 Wn. App. 641, 655, 9 P.3d 909 (2000) (relying on Section 211 for an individual's privilege to enter land to perform a duty created by legislative enactment).[6] We hold that Section 198 of the *Restatement* and its

---

[6] As Professor Stoebuck has observed, "While Washington has recognized hardly any of the many privileges described in the *Restatement of Torts*, there is reason to suppose the *Restatement* would be persuasive in Washington on the question of privilege, as it has been on other aspects of trespass law." 17 WILLIAM B. STOEBUCK & JOHN W.

comment d accurately state the limits on an actor's common law privilege to enter a third party's land to remove a chattel.[7]

In determining whether a proposed jury instruction is supported by sufficient evidence, the trial court views the evidence and inferences in the light most favorable to the proponent of the instruction. *State v. Hanson*, 59 Wn. App. 651, 656-57, 800 P.2d 1124 (1990). Viewing the evidence in the light most favorable to Mr. Harvey, the evidence was insufficient to support giving a no duty to retreat instruction.

Because there was no evidence of express or implied consent to Mr. Harvey's entering the parking lot, the relevant law is the law pertaining to the common law privilege to enter land to remove a chattel. The evidence was insufficient to support a jury finding that Mr. Harvey enjoyed the privilege. To begin with, it was unclear that Mr. Harvey had the immediate right to possession of the Blazer. Outside the presence of the jury, defense counsel represented at one point that Mr. Harvey retained title to the Blazer, but no evidence was ever presented that Mr. Harvey retained title. It seems incongruous that Mr. Harvey and his lawyers made so much of Mr. Lamere's failure to deliver title to the Cadillac if Mr. Harvey had never delivered title to the Blazer. Nonetheless, there was

---

WEAVER, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 10.2, at 650 (2d ed. 2004).

[7] As the parties recognize, a secured party's statutory privilege under RCW 62A.9A-609(b)(2) to repossess property if it proceeds without breach of the peace did not apply to Mr. Harvey, who had no Article 9A security interest.

some evidence from which jurors might infer that Mr. Harvey had an immediate right to possession.

But there was no evidence that before entering the parking lot, Mr. Harvey or Ms. Richardson contacted the owner of the Boone Street Apartments or anyone else with a possessory interest to make the required demand for delivery of the Blazer or permission to enter. There is no evidence that such a demand would have been futile or would have subjected the Blazer to a danger of serious harm.

We may affirm the trial court on any basis supported by the record. *State v. Norlin*, 134 Wn.2d 570, 582, 951 P.2d 1131 (1998). Because there was insufficient evidence that Mr. Harvey was in a place where he had a right to be, he was not entitled to a no duty to retreat instruction.

> *By arguing, successfully, that the trial court should not give a first aggressor instruction that was supported by sufficient evidence, Mr. Harvey waived his right to a no duty to retreat instruction*

Alternatively, Mr. Harvey's tactical decision to argue against the giving of a first aggressor instruction that was supported by evidence waived his right to have WPIC 16.08 included in the jurors' instructions.

In *State v. Redmond*, 150 Wn.2d 489, 495, 78 P.3d 1001 (2003), the Washington Supreme Court stated that "the no duty to retreat instruction is required where . . . a jury may objectively conclude that flight is a reasonably effective alternative to the use of force in self-defense." The jury below could have objectively concluded that flight was a

16

reasonably effective alternative for Mr. Harvey. And as Mr. Harvey points out in his petition, the prosecutor emphasized throughout trial, beginning with opening statement, that Mr. Harvey failed to leave what he recognized was a dangerous and escalating encounter.[8] Had there not been a viable first aggressor issue in this case (and setting aside the issue of whether Mr. Harvey had a right to be in the parking lot) *Redmond* would have required the giving of the no duty to retreat instruction.

But a no duty to retreat instruction, at least one reading as WPIC 16.08 does, will misstate the law if it is given in a case where there is evidence that the defendant was the first aggressor but he or she persuades the trial court not to give a first aggressor instruction. "[I]n general, the right of self-defense cannot be successfully invoked by an aggressor or one who provokes an altercation, unless he or she in good faith first withdraws from the combat at a time and in a manner to let the other person know that he or she is withdrawing or intends to withdraw from further aggressive action." *State v. Riley*, 137 Wn.2d 904, 909, 976 P.2d 624 (1999). In other words, if a defendant was the

---

[8] The State argues persuasively that the prosecutor's emphasis on the fact that Mr. Harvey did not leave was not to suggest that he had a duty to retreat, but was instead in support of the State's contention that these were premeditated murders. Mr. Harvey's trial lawyer appears to have believed as well that premeditation was the point of the prosecutor's references. When Mr. Harvey's proposed no duty to retreat jury instruction was discussed toward the end of trial, defense counsel did not argue that the instruction was needed because the State had implied through opening statement and testimony that Mr. Harvey had a duty to retreat.

first aggressor, he cannot rely on the defense of self-defense unless he *does* first retreat. Hence jurors would be misinformed by WPIC 16.08, which tells them that the defendant can "defend against [an] attack by the use of lawful force" and "[t]he law does not impose a duty to retreat."

Two reported decisions support this conclusion. In *State v. Benn*, 120 Wn.2d 631, 658-59, 845 P.2d 289 (1993), *aff'd in part on other grounds*, 161 Wn.2d 256, 165 P.3d 1232 (2007), the Supreme Court held that a trial court properly refused to give a no duty to retreat instruction where the defendant was clearly the first aggressor. *Benn* relied in part on *State v. Frazier*, 55 Wn. App. 204, 207-08, 777 P.2d 27 (1989), in which this court had held that a no duty to retreat instruction was properly refused where "[t]he primary issue below was the identity of the initial aggressor." If a no duty to retreat instruction is problematic in a case where the defendant is indisputably the first aggressor, then it is equally problematic in a case where reasonable jurors could find on disputed evidence that the defendant is the first aggressor.

Where the identity of the first aggressor and a defendant's right to stand his or her ground are both at issue, the trial court will not commit error by giving instructions on self-defense, the first aggressor instruction, and an instruction on an aggressor's revived right to self-defense following retreat. It will thereby enable both sides to argue their theories. From the three instructions, a defendant can argue that he or she was not the

18

first aggressor and was entitled to stand his or her ground. From the three instructions, the State can argue that if the jury finds that the defendant *was* the first aggressor, then he or she must retreat before enjoying a revived right of self-defense.

Sometimes, however, as happened here, a trial court will be persuaded that caution dictates not giving a first aggressor instruction even where the evidence would support it. As this court observed in *Arthur*, and the Supreme Court endorsed in *Riley*, the theories of a case can usually be sufficiently argued and understood by a jury without the giving of a first aggressor instruction. *Riley*, 137 Wn.2d at 910 n.2 (citing *Arthur*, 42 Wn. App. at 125 n.1). Where a defendant who was arguably a first aggressor successfully advocates against giving a first aggressor instruction, he or she cannot be heard to complain when the trial court refuses to give WPIC 16.08.

The evidence supported giving a first aggressor instruction here. Viewing the evidence in the light most favorable to the State, Mr. Harvey—knowing Mr. Lamere to be volatile and violent—told Ms. Richardson to move his flatbed truck into a position to block Mr. Lamere's egress from the parking lot and then stepped out of the truck and demanded his "f***ing Blazer" without having returned Mr. Lamere's Cadillac. While words alone will not constitute sufficient provocation for the giving of a first aggressor instruction, the act constituting the provocation need not be the striking of a first blow. *State v. Hawkins*, 89 Wash. 449, 455, 154 P. 827 (1916); *State v. Bea*, 162 Wn. App. 570, 577, 254 P.3d 948 (2011).

Mr. Harvey's petition is dismissed.

_____
Siddoway, J.

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Pennell, J.