IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 39354-2-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| CHASE ALLEN SPEEGLE, | ) | |
| | ) | |
| Appellant. | ) | |

PENNELL, J. — Chase Speegle received a 57-month sentence after a jury convicted him of second degree assault. We affirm Mr. Speegle's conviction but remand for resentencing.

FACTS

The incident giving rise to Mr. Speegle's conviction occurred at an East Wenatchee bar. Mr. Speegle was out with his girlfriend when he got into a verbal dispute with another patron. A bartender noticed the commotion and requested the bar's bouncer address the situation. The bouncer approached Mr. Speegle and the other patron and asked them both to leave. By that time, Mr. Speegle's girlfriend had bought Mr. Speegle a drink. Mr. Speegle took his drink, refused instructions to relinquish it back to the bar, and started walking toward the exit. When the bartender tried to take his drink, Mr. Speegle yelled and cussed at the bartender.

After some back and forth with the bouncer and bartenders, a physical altercation ensued that resulted in Mr. Speegle punching the bouncer in the face and breaking his nose. The State charged Mr. Speegle with second degree assault. At trial, Mr. Speegle claimed self-defense.

A surveillance video captured the assault and was shown at trial. According to the parties' testimonies, just prior to the start of the video, the bartender came up behind Mr. Speegle as he was walking toward the exit door and tried to grab his drink out of his hand, spinning him around. The bartender testified that Mr. Speegle then "squared up" to her and pulled his hand back as if he was going to hit her. 1 Rep. of Proc. (RP) (Oct. 27, 2022) at 325.

The surveillance video captured the parties' subsequent interactions. The video shows Mr. Speegle stepping away from the bouncer and bartender and walking toward the exit. Standing to the left of Mr. Speegle as he walked away, the bartender grabbed the drink out of Mr. Speegle's hand and poured beer on his head while the bouncer almost simultaneously stepped between them and placed his hands on Mr. Speegle's back to push or lead him toward the exit. In his immediate reaction, Mr. Speegle turned around and punched the bouncer in the face.

Mr. Speegle testified that at the time, he did not know who was pouring beer on him or who was pushing him from behind, and that he was hit in the head with the beer bottle as it was being poured on him. The video arguably does not show Mr. Speegle being hit. The bartender and the bouncer both denied hitting Mr. Speegle or witnessing him being hit.

Mr. Speegle requested the court instruct the jury on self-defense and also provide a "no duty to retreat" instruction. 1 RP (Oct. 27, 2022) at 439, 444-45. His theory was he was trying to leave the bar, but the bartender and bouncer prevented him from leaving when they grabbed him and took the drink out of his hand. The State conceded the court would likely allow the self-defense instruction, but objected to the no duty to retreat instruction. According to the State, the no duty to retreat instruction was inapplicable because, at the time of the altercation, Mr. Speegle did not have a right to be at the bar. The State also requested an initial aggressor instruction.

The court sided with the State on the instructions. The court instructed the jury on self-defense and provided an initial aggressor instruction. But the court did not provide an instruction on no duty to retreat.

In closing argument, the prosecution challenged Mr. Speegle's claim of self-defense based, in part, on the theory that his use of force was not necessary, and therefore

not lawful, because he could have reasonably walked away, i.e., retreated, rather than resort to using force. Counsel stated, "If you find that there was a reasonable alternative to him stopping and turning a hundred and eighty degrees and punching the bouncer in the face, *i.e.*, just keep on going, that ends this inquiry. Period. Full stop. The force he used was not lawful." 2 RP (Oct. 28, 2022) at 522-23.

The defense emphasized its theory that Mr. Speegle had the right to use force and defend himself because the bartender assaulted him—by grabbing Mr. Speegle's wrist and turning him around, pouring beer on him, and hitting his head with the beer bottle—and took his property—his drink—while the bouncer, who did not identify himself, simultaneously grabbed Mr. Speegle from behind.

The jury found Mr. Speegle guilty of second degree assault.

Prior to sentencing, the State filed a sentencing memorandum. The State addressed Mr. Speegle's offender score and attached records of Mr. Speegle's prior out-of-state convictions, including a certified sentencing order of a third degree assault conviction from Eagle County, Colorado. Per the Colorado sentencing order, Mr. Speegle pleaded guilty to "Assault 3-Know/Reckless Cause Injury" in October 2014. Clerk's Papers (CP) at 46, 52 (some capitalization omitted). The State's argument, opposed by Mr. Speegle, was that Mr. Speegle's Colorado assault conviction was comparable to a Washington

4

felony offense of assault in the third degree. The sentencing court agreed with the State

and included one point for the Colorado conviction in calculating Mr. Speegle's offender

score. The resultant standard range sentence was 43 to 57 months.

At sentencing, the court sentenced Mr. Speegle to 57 months in custody to be

followed by 18 months of community custody. The court also imposed a $500 crime

victim penalty assessment.

Mr. Speegle timely appeals.

## ANALYSIS

Mr. Speegle challenges his conviction and his sentence. He argues: (1) the trial

court wrongly failed to provide a "no duty to retreat" instruction, (2) the court erroneously

provided an initial aggressor instruction, (3) the sentencing range was improperly inflated

based on an inapplicable out-of-state conviction, (4) the trial court violated the

appearance of fairness doctrine, and (5) the judgment and sentence contains improper

legal financial obligations (LFOs). We disagree with Mr. Speegle's challenges to his

conviction, but we agree with his arguments regarding the out-of-state conviction and

LFOs. We address each claim in turn.

*1. No duty to retreat instruction*

A person acting in self-defense has "no duty to retreat" if they are "assaulted in a place where [they have] a right to be." *In re Pers. Restraint of Harvey*, 3 Wn. App. 2d 204, 215, 415 P.3d 253 (2018). The right to stand one's ground is clear when an individual is assaulted in their home or at a public place. *Id.* at 215-16. But the issue is more complex when one is on another's private property. In such circumstances, the right to stand one's ground turns on whether they have a license or privilege to be on the property. *Id.*

Mr. Speegle contends the court should have instructed the jury on no duty to retreat. Because Mr. Speegle's argument turns on the factual applicability of the instruction, not the applicable law, our review of the trial court's decision is for abuse of discretion. *See State v. Condon*, 182 Wn.2d 307, 315-16, 343 P.3d 357 (2015).

The trial court did not abuse its discretion in denying a no duty to retreat instruction. Mr. Speegle was told to leave the bar well before he was involved with any sort of conflict with the bartender or the bouncer. Thus, any right he had to be on the property expired at that point. Because Mr. Speegle did not have a right to be at the bar, he was not entitled to stand his ground or to have the jury instructed on the concept of no duty to retreat.

6

Mr. Speegle claims the concept of no duty to retreat remains applicable, despite the fact that he was told to leave the bar. He points out that he was entitled to leave the bar in peace, without being subject to assault. Thus, once he was attacked with the beer bottle, he was entitled to stand his ground and defend himself.

The flaw in Mr. Speegle's argument is that it conflates the concepts of self-defense and the right to stand one's ground. There is no dispute that, despite being told to leave, Mr. Speegle had the right to peaceably leave the bar. Thus, Mr. Speegle retained the right of self-defense. But what Mr. Speegle lost through his unprivileged presence was the right to use force in self-defense when a reasonable option was to leave. The no duty to retreat instruction was inapplicable.

*2. Initial aggressor*

Mr. Speegle claims the trial court should not have provided the jury an initial aggressor instruction. Although his attorney did not object to the instruction at the time of trial, Mr. Speegle claims the failure to object amounted to ineffective assistance of counsel.

To be entitled to relief on an ineffective assistance claim, Mr. Speegle must show both (1) deficient performance and (2) prejudice. *Strickland v. Washington*, 466 U.S. 668,

7

687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Failure to meet either prong precludes relief.

In general, the right of self-defense does not apply to someone who acts as a first aggressor or provokes an altercation. *State v. Riley*, 137 Wn.2d 904, 909, 976 P.2d 624 (1999). The court may provide the jury with a first aggressor instruction in cases where "(1) the jury can reasonably determine from the evidence that the defendant provoked the fight, (2) the evidence conflicts as to whether the defendant's conduct provoked the fight, or (3) the evidence shows that the defendant made the first move by drawing a weapon." *State v. Anderson*, 144 Wn. App. 85, 89, 180 P.3d 885 (2008). The provoking conduct cannot be words alone, and must be reasonably likely to elicit a belligerent response. *State v. Sullivan*, 196 Wn. App. 277, 289-90, 383 P.3d 574 (2016).

Mr. Speegle's attorney did not perform deficiently in failing to object to an initial aggressor instruction because any such objection would have been futile. *See In re Pers. Restraint of Davis*, 152 Wn.2d 647, 748, 101 P.3d 1 (2004). According to testimony from the State's witnesses, Mr. Speegle pulled back his arm as if he was going to hit the bartender in response to the attempt to take his drink away. Mr. Speegle's threatening gesture occurred before the bartender threw beer in Mr. Speegle's face. Given this sequence of events, the initial aggressor instruction was justified.

Mr. Speegle has not shown his counsel performed deficiently by refraining from objecting to the initial aggressor instruction. His ineffective assistance claim therefore fails.

*3. Prior out-of-state conviction*

Mr. Speegle contends his sentencing range was improperly inflated due to the erroneous inclusion of a Colorado conviction in his offender score. Our review is de novo. *State v. Olsen*, 180 Wn.2d 468, 472, 325 P.3d 187 (2014).

Under the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, in calculating an offender score, prior out-of-state convictions may be counted if they are comparable to a Washington crime. RCW 9.94A.525(3). The State holds the burden of proving the offenses are comparable. *State v. Thomas*, 135 Wn. App. 474, 483, 144 P.3d 1178 (2006).

"'Comparability is both a legal and a factual question.'" *State v. Wilson*, 170 Wn.2d 682, 690, 244 P.3d 950 (2010) (quoting *State v. Collins*, 144 Wn. App. 547, 553, 182 P.3d 1016 (2008)). Courts conduct a two-step comparability analysis to determine whether an out-of-state conviction should count as part of a defendant's offender score. *Olsen*, 180 Wn.2d at 472-73. First, courts compare the elements of the out-of-state offense with the elements of the comparable Washington offense, both as defined on the

date the out-of-state offense was committed. *Id.* The crimes are comparable if the elements of the out-of-state crime are identical to or narrower than the Washington crime. *State v. Davis*, 3 Wn. App. 2d 763, 771, 418 P.3d 199 (2018).

If the elements are comparable, the out-of-state conviction is counted in calculating the offender score. *Thomas*, 135 Wn. App. at 485. But if the elements of the foreign conviction are different or broader than the Washington equivalent, courts look to the conduct underlying the out-of-state conviction to determine whether it would have violated the comparable Washington statute. *Id.*; *State v. Morley*, 134 Wn.2d 588, 605-06, 952 P.2d 167 (1998). Only undisputed facts previously admitted, stipulated to, or proved beyond a reasonable doubt are considered. *Davis*, 3 Wn. App. 2d at 772.

Mr. Speegle committed the assault in Colorado on February 16, 2014. The Colorado statute defining third degree assault at the time provided: "A person commits the crime of assault in the third degree if . . . [t]he person knowingly or recklessly causes bodily injury to another person or with criminal negligence the person causes bodily injury to another person by means of a deadly weapon." Former COLO. REV. STAT. ANN. § 18-3-204(1)(a) (2012). As made clear by Colorado's model criminal jury instructions, this statute encompasses two different versions of assault: (1) by knowingly or recklessly

10

causing harm to another *or* (2) negligently causing harm to another by means of a deadly weapon.

At Mr. Speegle's sentencing hearing, the court agreed with the State that the Colorado statute was comparable to Washington's offense of third degree assault. In 2014, the Washington statute provided: "A person is guilty of assault in the third degree if he or she . . . [w]ith criminal negligence, causes bodily harm to another person by means of a weapon or other instrument or thing likely to produce bodily harm." RCW 9A.36.031(1)(d).

Comparing the two statutes, the Colorado assault statute is broader than Washington's. Both statutes cover negligently causing harm by means of a weapon. But Colorado's statute also covers knowingly or recklessly causing harm, regardless of the presence of a weapon. Given it is broader, Colorado Revised Statute Annotated § 18-3-204(1)(a) is not legally comparable to Washington's third degree assault statute, RCW 9A.36.031(1)(d).

Because the Colorado and Washington offenses are not legally comparable, we turn to factual comparability. This involves an assessment of whether the facts admitted, stipulated to, or proved beyond a reasonable doubt at the time of the Colorado conviction

11

are comparable to Washington's third degree assault statute. *See Thomas*, 135 Wn. App. at 485.

Here, the Colorado sentencing order states Mr. Speegle pleaded guilty to "Assault 3-Know/Reckless Cause Injury." CP at 46, 52 (some capitalization omitted). This suggests Mr. Speegle was convicted of the version of the Colorado statute that is not comparable to Washington's third degree assault statute. However, the record on this issue is not necessarily complete. We therefore remand for resentencing, at which time the parties may expand the record to include additional evidence and request any lawful sentence. *See* RCW 9.94A.530(2); *State v. Jones*, 182 Wn.2d 1, 338 P.3d 278 (2014).

## 4. Fair and impartial hearing by a fair and impartial judge

Mr. Speegle claims he was deprived of his right to be sentenced in a fair and impartial hearing by a fair and impartial judge when the court made disparaging remarks during sentencing. This argument was not raised to the trial court. Thus, to the extent Mr. Speegle's argument is that the trial judge violated the nonconstitutional appearance of fairness doctrine, his claim has been waived. *State v. Tolias*, 135 Wn.2d 133, 140, 954 P.2d 907 (1998). To the extent Mr. Speegle's argument is that he was deprived of his due process right to a fair hearing, relief turns on whether he can demonstrate a manifest constitutional error. *See* RAP 2.5(a)(3).

"A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136, 75 S. Ct. 623, 99 L. Ed. 942 (1955). An impartial tribunal is one marked by the absence of actual or apparent bias. *See State v. Post*, 118 Wn.2d 596, 618, 826 P.2d 172, 837 P.2d 599 (1992). We presume judges act without bias. *Pers. Restraint of Davis*, 152 Wn.2d at 692. "The party seeking to overcome that presumption must provide specific facts establishing bias. Judicial rulings alone almost never constitute a valid showing of bias." *Id*.

Mr. Speegle does not point to any extrinsic evidence of bias; instead, his challenge is based solely on the following comments made by the trial court at sentencing:

> I will note that I have reviewed all of the letters that were received asking for leniency for this defendant. There were some things that stood out about those letters—I certainly respect folks submitting letters and—I—I always like to consider them for the weight that is appropriate.
>
> One thing that stood about—stood out about the letters that—that were received and reviewed is that I didn't see any from anyone who was there at the bar that night in January of 2022. So, they could talk about how hardworking Mr. Speegle is and what a—how hard he's been trying and there's a lot of wonderful things they could say about Mr. Speegle and I have every reason to believe what they were telling me; but they weren't there that night and they didn't see it. At least not any indication from any of the letters that I saw.
>
> Nor was there any indication that anyone who wrote the letters witnessed the video that was Exhibit 1 at the trial—the surveillance video that is, I think, probably the best evidence of what actually took place that day. That night.
>
> I don't recall any of the letter writers being here for the trial itself and hearing the testimony. In fact, I think it was only Mr. Speegle's parents

13

and significant other. If there was anyone else that was present for the trial itself I don't—I don't recall them. Point being, I may be looking at things other than what the letter writers were looking at. And I want to be clear about that.

There are certainly plenty of cases in the course of human events where people are entrepreneurial, hardworking, trying their best and have many wonderful qualities and then they go and they commit yet another violent felony crime. And the statute doesn't—the—the law doesn't distinguish be—it doesn't say well, if someone is king [sic], gentle, hardworking, and entrepreneurial it cancels out the commission of yet another violent felony crime.

The law talks about violent felony crime. And that's what the case is about. That's what the jury found. They found that this defendant was an aggressor. The self-defense argument was without any basis. And I think one of the things that really stood out to me, not only was Mr. Speegle—not only did we hear more F-bombs from Mr. Speegle during his testimony than I have ever heard from anyone in thirty years of doing this—being in the law profession.

I have never seen anyone get on the witness stand and express themselves in the way that Mr. Speegle did. And it wasn't just how he expressed it and the F-bombs, it was the intense protestations to the effect that this was ridiculous and this was stupid. I heard that a lot. Many, many times. And if that's the way Mr. Speegle conducts himself in this controlled environment of this courtroom, how in the world could we expect he would conduct himself in any way different on the scene, in a bar, after drinking beer?

. . . [O]ne thing that . . . stood out about . . . the video from outside the bar. Police officers roll up, they've got Mr. Speegle on the video. His animated, intense F-bomb laden way of expressing himself, I thought whoa, is this a—an indicator that this defendant had imbibed a bunch of alcohol and it affected his behavior? Well, after I saw him on the witness stand, I had to reexamine that. Apparently, it's not, that's just the way Mr. Speegle acts. That's the way he conducts himself.

. . . [Defense counsel] did everything humanly possible to defend Mr. Speegle and establish that self-defense. He just didn't have it. It wasn't in the video. The blood was on the wrong side of the head. There was nothing

14

in the video to show—to support that Mr. Speegle was cracked by a bottle. Zero. None.

He was mad. He was mad because the beer was poured on him. He was mad because someone was trying to take his beer. He was made [sic] because he was being asked to leave the bar. All of those letter writers, they don't get it. They didn't see it. They really don't know what they're talking about. Mr. Speegle was mad.

The jury didn't find the self-defense argument had any merit. The video showed it had no merit. It was something he came up with and he argued about why this was so ridiculous and stupid, this whole process.

And so, one—the other thing that I didn't hear, and I know Mr. Speegle wants the Court to believe he has all this remorse, I think the only remorse he's got is that the def—that the jury didn't buy his argument. One time, I was listening, one time and only one time during the trial, unless I missed it, and I was here. Only one time did he say anything about how he felt badly about Mr. Seims. One time.

And the thing that really stands out about it is even if the jury had believed Mr.—Mr. Speegle, he agrees his whole story is that he mistakenly hit Mr. Seims thinking that Mr. Seims had—had done something to him—had cracked him with the bottle. Well, guess what? Mr. Seims hadn't cracked him with the bottle. That wasn't true at all. And so, by his own story, he hit Mr. Seims by mistake.

I would have thought there'd be some remorse about that. And I saw none. I have still seen none. I see remorse that Mr. Speegle has put himself in yet another violent felony crime conviction situation. And I feel badly for him. I'm sure there's lots of wonderful things about Mr.—Mr. Speegle. But like I say, it doesn't cancel out the commission of a crime.

. . . .

And by the way, Exhibit 1, the video, the surveillance video, he didn't just punch him. He pushed him and he cocked his hand back again and he, but for the grace of God, he would have punched him in the face again. I watched it. It was right there. I don't know if anybody else saw it, but it was plain as day to me.

2 RP (Nov. 15, 2022) at 658-63.

Nothing about these comments indicates the court was predisposed to rule against Mr. Speegle before hearing the evidence presented at trial and sentencing. Once the court considered the case, it was entitled to enter a ruling adverse to Mr. Speegle and to explain its reasons for so doing. "It is not evidence of actual or potential bias for a judge to point out to a defendant the harm caused" by their conduct. *State v. Worl*, 91 Wn. App. 88, 97, 955 P.2d 814 (1998).

Mr. Speegle cites to *State v. Lemke*, 7 Wn. App. 2d 23, 434 P.3d 551 (2018), where the trial court was reversed based on inappropriate statements directed toward the defendant. But *Lemke* is readily distinguishable. The trial judge in *Lemke* addressed the defendant using profane and disparaging language. That did not happen here. Instead, the court criticized Mr. Speegle's legal arguments and his failure to accept responsibility for his actions. These comments amount to a rejection of Mr. Speegle's legal position, not a biased personal attack. Mr. Speegle has not shown a manifest violation of his due process right to a fair hearing.

*LFOs*

Mr. Speegle challenges the imposition of two LFOs: a supervision fee and a crime victim penalty assessment. Under current law, supervision fees are prohibited. RCW 9.94A.703. And the crime victim penalty assessment may not be imposed against

No. 39354-2-III
*State v. Speegle*

defendants who are "indigent" as defined by RCW 10.01.160(3). RCW 7.68.035(4).

Because we are remanding this matter for resentencing, Mr. Speegle may raise his

objections to the LFOs at his resentencing hearing.

CONCLUSION

Mr. Speegle's conviction is affirmed. We remand this matter for resentencing.

A majority of the panel has determined this opinion will not be printed in

the Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Pennell, J.

I CONCUR:

_____
Staab, J.

17

No. 39354-2-III

LAWRENCE-BERREY, C.J. (concurring) — I agree with the majority opinion, but write separately to ask the trial court to reconsider its decision to impose a high-end standard range sentence. If a picture is worth a thousand words, a video is worth ten thousand.

The bartender testified that she threw a beer at Mr. Speegle in self-defense as he reared back to hit her. The video refutes this.

The video shows that Mr. Speegle had turned to walk out of the bar, and that the bouncer had come between the bartender and Mr. Speegle and was guiding Mr. Speegle toward the door. Mr. Speegle's back was turned to the bouncer and the bartender. The bartender, with the beer bottle in her hand, reached over and around the bouncer, and quickly shook the upturned bottle over Mr. Speegle's head until it emptied. The last shake of the bottle arguably hit the top of Mr. Speegle's head. Mr. Speegle ducked, trying to avoid the beer, turned, likely did not see the bartender because she was hidden behind the bouncer, and hit the only person he thought might have assaulted him.

Whether the bottle hit the top of Mr. Speegle's head makes no difference. An assault includes an offensive touching, irrespective of any resulting injury. *State v. Elmi*, 166 Wn.2d 209, 215 n.3, 207 P.3d 439 (2009). Pouring a beer over a person's head is an assault. The bartender's assault on Mr. Speegle caused Mr. Speegle to assault the bouncer.

If these facts were presented in the context of a civil trial, Mr. Speegle could have joined the bartender in the litigation, and argued that the bartender was nearly entirely at fault for the bouncer's broken nose. The bartender knew that Mr. Speegle was highly agitated, yet provoked his response by pouring a beer over his head as he attempted to leave.

Mr. Speegle's criminal history elevates his sentencing range, and need not be a separate factor to increase his sentence. Mr. Speegle's failure to show remorse for breaking the bouncer's nose and his hostility about the proceedings likely contributed to the jury's verdict. Nevertheless, the fact established by the video remains: the assault would not have occurred but for the bartender first assaulting Mr. Speegle. Respectfully, I would ask the trial court to reconsider its decision to impose a high-end sentence.

_Lawrence-Berrey, C.J._
Lawrence-Berrey, C.J.